Per Curiam :

This case was referred pursuant to Buie 45 to Mastín G. White, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed January 5,1962. Briefs were filed and exceptions to the commissioner’s report were taken by both parties. The case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover, defendant is vested with a perpetual easement of flight and plaintiff will execute a deed conveying such easement in accordance with the conclusion of law herein.
OPINION OF COMMISSIONER
The plaintiff brings this action to recover just compensation for the taking by the Government of a so-called avigation easement over the plaintiff’s property, an 11-acre tract of land, with industrial improvements on it, located just across U.S. Highway 31 from the Bunker Hill Air Force Base in Indiana.
The plaintiff is an Indiana corporation. It is a wholly owned subsidiary of the Sicanoff Vegetable Oil Corporation, which is a successful merchandiser and broker that con *303 ducts large-scale operations at wholesale in fats, oils, and grains. Sometime prior to 1951, the parent corporation decided to enter the business of producing soybean oil, and the plaintiff was organized on April 1, 1951, to handle such business.
Before organizing the plaintiff, the Sicanoff Vegetable Oil Corporation made a careful investigation, extending over a considerable period, of time, in connection with the selection of a site for the soybean oil processing plant which it proposed to establish. Upon the basis of this investigation, the parent corporation decided that the most advantageous available site was one located on the east side of U.S. Highway 31 at a point near Bunker Hill, Indiana, and approximately halfway between Peru and Kokomo, Indiana. There was available for purchase at that location a 6-acre parcel of land, that contained a shut-down soybean oil processing plant. The 6-acre parcel of land was located on or near several main highways that traversed an important soybean producing area; it was contiguous to the main east-and-west freight line of the Pennsylvania ftailroad (with a siding to serve the soybean oil processing plant); and it was located within a mile of the north-and-south line of the Nickel Plate Bailroad.
The shut-down soybean oil processing plant referred, to in the preceding paragraph had been constructed in 1944 and 1945 for the production of soybean oil through the expeller process. In an expeller plant, the oil is removed from the soybeans primarily by mechanical pressure. This method was becoming uneconomical by the end of World War II and was being replaced by the solvent method, in which the oil is removed from the soybeans by means of a chemical reaction through the use of a solvent. The then owner discontinued the use of the Bunker Hill expeller plant sometime prior to 1951, and by 1951 the plant was in a deteriorated condition.
The shut-down soybean oil processing plant near Bunker Hill, and the 6-acre parcel of land on which the plant was situated, were purchased by the Sicanoff Vegetable Oil Corporation on March 7,1951, for $130,000. The ownership of the property was vested in the plaintiff at the time of its organization by the parent corporation on April 1,1951.
*304 At tbe time when, the 6-acre parcel of land and the industrial improvements on it were purchased in March 1951, and at the time when the ownership of the property was vested in the plaintiff on April 1,1951, there was located just across TJ.S. Highway 31 from the property an inactive military airfield owned by the Government. This airfield had been activated originally on July 1, 1942, for a naval air training station, and had then been placed in an inactive status on or about July 1,1946. In March and April of 1951, portions of the airfield were leased by the Government to private persons for farming purposes.
There was on the inactive airfield referred to in the preceding paragraph a northeast-southwest runway 5,000 feet long; and the 6-acre parcel of land acquired by the plaintiff was situated to the northeast of, and in a direct line with, that runway. It was a distance of 4,000 feet from the northeast end of the northeast-southwest runway to the 6-acre parcel of land at the nearest point. The runway was in a state of disrepair, with weeds growing through cracks in the pavement, as of March and April 1951.
The evidence in the record shows that only piston-driven aircraft were flown to and from the Bunker Hill military airfield during the period 1942-1946. We do not have in the record any direct evidence regarding the relationship of such flights to the 6-acre parcel of land and the soybean oil processing plant located just across TJ.S. Highway 31 from the airfield. However, the circumstantial evidence warrants the inference that although the piston-driven aircraft flew regularly and frequently over the property at relatively low altitudes just before landing from the northeast on, or just after taking off toward the northeast from, the northeast-southwest runway, such flights did not produce noise of such intensity or air turbulence of such force as to constitute substantial interferences with the use and enjoyment of the sub-jacent property. Hence, it must be concluded that the Government did not take an avigation easement in the airspace over the 6-acre parcel of land during the 1942-1946 period. Highland Park, Inc. v. United States, 142 Ct. Cl. 269, 273 (1958).
*305 The plaintiff, after acquiring the 6-acre parcel of land and the improvements on it, embarked upon a program to enlarge the acreage and to rehabilitate the shut-down soybean oil processing plant. Two parcels of land contiguous to the 6-acre tract were purchased for a total price of $3,800. The property, after the acquisition of the additional land, contained a total of 11.393 acres. The plaintiff also spent approximately $52,000 on remodeling, repairing, and maintenance work in order to put the shut-down soybean oil processing plant in operating condition. Employees to operate the plant were recruited, and an experienced and competent manager was employed. As a result of these activities, the plant was put into operation on or about September 1,1951. Thereafter, the plaintiff spent an additional sum of approximately $18,000 for the further remodeling and repairing of the plant.
At all times while enlarging the acreage and rehabilitating the existing expeller plant, it was the plaintiff’s intention to supplement the expeller plant by constructing on the premises a 100-ton plant for the extraction of soybean oil through the more modern and efficient solvent process, to increase the existing 150,000-bushel grain storage facilities on the premises by constructing storage bins for an additional 1,000,000 bushels of grain, and to establish on the premises a depot for fats and oils by constructing storage tanks for such commodities. A competent engineering firm was retained by the plaintiff at a cost of approximately $15,000, and the personnel of this firm coordinated the preparation of plans for the plaintiff’s expansion program. The preparation of the plans was completed in the summer of 1952. They contemplated the expenditure by the plaintiff of approximately $2,000,000 on the construction of the additional facilities. The plaintiff was in a position to obtain the necessary financing for the expansion program.
The plans that were prepared for the expansion of the plaintiff’s grain storage facilities involved the construction of a concrete headhouse 206 feet high and 51 silo-type bins 120 feet high. In this connection, it should be mentioned that the highest existing structure on the property was 67 feet high.
*306 At about the time when the preparation of the plans for the expansion of the plaintiff’s facilities was completed, the plaintiff’s president read an item in the July 7,1952, issue of the Peru, Indiana, Daily Tribune that stated in part as follows:
Reactivation of the Bunker Hill Naval Air station was practically assured Monday with passage by the Senate of an $18,663,000 appropriation. The House had earmarked $24,777,000 for Bunker Hill, but the Senate cut the amount by six million. Both houses of Congress were expected to approve the lower figure before adjourning later Monday.
This newspaper item was the first information that any of the plaintiff’s officers had received regarding the prospective reactivation of the military airfield located just across TJ.S. Highway 31 from the plaintiff’s property.
An appropriation of more than $18,000,000 for the reactivation of the Bunker Hill military airfield was made by the Congress and approved by the President in July 1952.
Beginning on or about July 7, 1952, when he read the newspaper item previously quoted, and continuing into December 1952, the plaintiff’s president endeavored repeatedly, but unsuccessfully, to obtain definite information regarding the Government’s plans for the reactivation of the Bunker Hill military airfield, and the extent to which the Government’s plans would affect the plaintiff’s own plans for the construction and operation on its property of a plant and related facilities to produce soybean oil through the solvent process. In particular, the plaintiff’s president was anxious to find out definitely — but could not do so — whether the new headhouse and storage bins which the plaintiff planned to build would, if constructed, project upward into the flight pattern of aircraft using the northeast-southwest runway at the Bunker Hill military airfield for landings and takeoffs.
Because of the uncertainty referred to in the preceding paragraph, the plaintiff in December 1952 shut down its ex-peller plant and discontinued the activities looking toward the construction of a solvent-process plant and related facilities on its property. The expeller operation was economically unsound, and the only hope of developing on *307 the premises a financially successful venture for the production of soybean oil depended upon the construction of an adequate solvent-process plant and related facilities.
After shutting down its plant in December 1952, the plaintiff unsuccessfully persisted for a number of years in its efforts, either directly or through legal counsel, to obtain from the Government a definite statement as to whether the plaintiff could carry out its expansion plans, particularly with respect to the height of the proposed storage facilities, without interfering with the flight of aircraft to and from the Bunker Hill military airfield. The first direct and specific information on this point that the plaintiff ever received from the Government came through the service on the plaintiff in August 1960 of a condemnation petition and declaration of taking for a clearance easement over the plaintiff’s property. That proceeding was instituted by the Government in the United States District Court for the Northern District of Indiana; and by means of it the Government obtained a perpetual clearance easement in the airspace over the plaintiff’s property, beginning at a height of 62*4. feet above the ground at the southern boundary of the plaintiff’s property and extending toward the northern boundary at an upward rate of 1 foot for each 50 feet of horizontal distance, so that the clearance easement begins at a height of 92 feet above the ground at the northern boundary of the plaintiff’s property. By virtue of this clearance easement, the Government since August 1960 has possessed and exercised the authority to prevent any structures or trees on the plaintiff’s property from intruding into the airspace above the plane which represents the beginning elevation of the clearance easement.
In the meantime, there was inaugurated at the Bunker Hill military airfield on June 1, 1953, a huge construction program that involved the construction of many buildings and facilities, including the rehabilitation and extension of the primary northeast-southwest runway. The initial work on the northeast-southwest runway involved the construction of a 10,000-foot concrete runway to replace the deteriorated 5,000-foot runway mentioned previously in the opinion. The extension of the runway from the original 5,000 feet to a *308 total of 10,000 feet resulted from tire addition of 5,000 feet onto the southwest end of the runway. At a later time, the northeast-southwest runway was extended again by the addition of 2,500 feet of paved runway onto the southwest end of the runway, so that the total length of the paved runway thereafter was 12,500 feet. The northeast end of the runway, which is the end nearest to the plaintiff’s property, has never been extended in the direction of the plaintiff’s property; and the distance from that end of the runway to the plaintiff’s property at the nearest point has continued to be 4,000 feet.
During the course of the construction program mentioned in the preceding paragraph, the military airfield at Bunker Hill was officially reactivated, was named the Bunker Hill Air Force Base, and was placed under the jurisdiction of the Air Force.
In October 1955, military aircraft were permanently assigned to the Bunker Hill Air Force Base for the first time after the reactivation of the base. The first aircraft permanently assigned to the reactivated base were fighter jets of the types designated as the F-94 Starfire and the F-86 Sabre. Since October 1955, military aircraft have been permanently assigned to the Bunker Hill Air Force Base at all times. Most of the planes assigned to the base have been jets, and they have included fighters, bombers, and tankers.
All military jet aircraft using the facilities of the Bunker Hill Air Force Base have taken off from or landed on the northeast-southwest runway. Such aircraft, in landing from the northeast or in taking off toward the northeast, have flown over the plaintiff’s property. The evidence in the record indicates that the flights by military jet aircraft over the plaintiff’s property immediately before landing from the northeast on, or immediately after taking off toward the northeast from, the northeast-southwest runway have averaged considerably more than a thousand per month during the period since such flights began in October 1955. These flights over the plaintiff’s property have generally been at altitudes of less than 500 feet above the surface of the ground, and many of the flights, especially by aircraft approaching *309 to land from tbe northeast on the northeast-southwest runway, have been at altitudes as low as 167 feet above the surface of the ground. Jet aircraft have occasionally flown over the plaintiff’s property at altitudes lower than 167 feet above the surface of the ground.
When military jet aircraft fly over the plaintiff’s property immediately after taking off toward the northeast from, or immediately prior to landing from the northeast on, the northeast-southwest runway at the Bunker Hill Air Force Base, they make a loud, whining noise of about 100 decibels on the average and up to 135 decibels on occasion, and they cause great turbulence in the air. These flights have been of such frequency and at such low altitudes as to constitute direct, immediate, and substantial interferences with the use and enjoyment of the plaintiff’s property. Therefore, it must be concluded that the Government has taken an avigation easement, or an easement of flight, for its aircraft in the airspace over the plaintiff’s property. United States v. Causby, 328 U.S. 256, 266 (1946).
With respect to the question of the elevation at which the avigation easement has been taken by the Government in the airspace over the plaintiff’s property, it appears that the frequency of flights by the Government’s jet aircraft over the plaintiff’s property at altitudes as low as 167 feet above the surface of the ground fixes the elevation at which the easement of flight has been taken. As previously indicated, there is evidence in the record to the effect that military jet aircraft of the Government have occasionally flown over the plaintiff’s property at altitudes of less than 167 feet, but the evidence does not establish that such flights have occurred with the frequency that would be necessary to prove the taking of an avigation easement in the airspace below the 167-foot level.
Compensation for the taking of an easement by the Government over privately owned land must be determined as of the time and place of the taking. United States v. Dow, 357 U.S. 17, 20 (1958); Potts v. United States, 130 Ct. Cl. 88, 94 (1954). Since the regular intrusions by the Government’s military jet aircraft into the lower reaches of the airspace over the plaintiff’s property began in October 1955 and have *310 continued with great frequency since that time, it appears that the time of the taking of the avigation easement in the present case was on or about October 1, 1955. Highland Park, Inc. v. United States, supra, at p. 273; Adaman Mutual Water Co. v. United States, 143 Ct. Cl. 921, 924 (1958); Matson v. United States, 145 Ct. Cl. 225, 229 (1959).
The measure of just compensation for the taking of an easement by the Government over privately owned land is the difference between the fair market value of the land just before the easement was taken and the fair market value of the land just after the easement was taken. Federal Real Estate and Storage Co. v. United States, 79 Ct. Cl. 667, 682 (1934); Karlson v. United States, 82 F. 2d 330, 337 (8th Cir., 1936). A number of witnesses testified regarding the fair market value of the plaintiff’s property just before the Government’s military jet aircraft began to fly regularly over the property at low altitudes in October 1955. However, there was such a great variance in the opinions expressed by the witnesses, who fixed the value of the property all the way from $70,000 to $600,000, that their testimony on this point was not very helpful. In the circumstances, I believe that it would be proper to take as the fair market value of the plaintiff’s property just before October 1955 a figure approximating the amount that had been spent on the acquisition of the property and the rehabilitation of the shut-down soybean oil processing plant. It is true that the expeller plant was substandard as regards efficiency and economy of operation even after it was rehabilitated. However, the plaintiff was prepared to supplement the expeller plant by constructing on the premises an up-to-date solvent-process plant and related facilities for a modem and efficient operation. The property provided a very advantageous site for such an installation. Consequently, I do not believe that the sum of approximately $200,000 which had been invested in the property represented an improvident investment. Hence, it seems to me that the court might properly adopt the figure of $200,000 as the fair market value of the plaintiff’s property just before October 1955.
There was also a wide disparity in the opinions expressed by the witnesses regarding the fair market value of the *311 plaintiff’s property just after the Government’s military jet aircraft began to fly regularly over the property at low altitudes in October 1955. The estimates of the witnesses on this point ranged from $3,941 up to $80,000, so that here, again, the wide variance detracted from the helpfulness of the testimony.
The more persuasive evidence in the record indicates that, even after the Government’s military jet aircraft began to fly regularly and frequently over the plaintiff’s property at relatively low altitudes in October 1955, the plaintiff could still have proceeded to construct and operate on the property a solvent-process plant and related facilities for the production of soybean oil. However, such a venture would have been more difficult and expensive after the regular and frequent jet flights at low altitudes over the property began than it would have been prior to that time, because of the noise and vibration resulting from such flights and because it was no longer permissible to construct on the premises a head-house with the efficiency and economy of operation that would have been derived from the 206-foot height of the concrete headhouse planned by the plaintiff. In this connection, though, the airspace up to a height of 16T feet above the ground was still subject to the plaintiff’s exclusive control.[1] Therefore, I believe that the figure of $80,000 should be adopted as the fair market value of the plaintiff’s property immediately after the beginning of regular and frequent flights by the Government’s military jet aircraft at low altitudes over the plaintiff’s property.
On the basis of the foregoing discussion, I believe that a judgment should be entered for the plaintiff in the sum of $120,000.
FINDINGS OF FACT
1. The plaintiff, Mid-States Fats and Oils Corporation, is a corporation organized and existing under the laws of the State of Indiana. It is a wholly owned subsidiary of the Sicanoff Vegetable Oil Corporation, which is a successful *312 merchandiser and broker, conducting large-scale operations at wholesale in fats, oils, and grains. The parent corporation decided sometime before 1951 to enter the business of producing soybean oil, and the plaintiff was organized on April 1,1951, to handle such business.
2. (a) Prior to organizing the plaintiff, as indicated in finding 1, the Sicanoff Vegetable Oil Corporation had made a careful investigation, extending over a considerable period of time, in connection with the selection of a site for the soybean oil processing plant which it proposed to establish. Upon the basis of this investigation, the parent corporation decided that the most advantageous available site was one located on the east side of U.S. Highway 31 at a point near Bunker Hill, Indiana, and approximately halfway between Peru and Kokomo, Indiana. There was available for purchase at that location a 6-acre parcel of land that contained a shut-down soybean oil processing plant. The plant consisted of a 2-story concrete block building, nine silo-type grain storage tanks that ranged in diameter from 22 feet to 30 feet and in height from 52.5 feet to 60.8 feet, a scale house 16 feet by 93 feet, and a warehouse 40 feet by 120 feet. The concrete block building, which housed the major portion of the processing plant and provided office space as well, included a head-house approximately 67 feet high. The 6-acre parcel of land was located on or near several main highways that traversed an important soybean producing area; it was contiguous to the main east-and-west freight line of the Pennsylvania Railroad (with a siding to serve the soybean oil processing plant); and it was located within a mile of the north-and-south line of the Nickel Plate Railroad.
(b) The plant referred to in paragraph (a) of this finding had been constructed in 1944 and 1945 for the production of soybean oil through the expeller process. In an expeller plant, the oil is removed from the soybeans primarily by mechanical pressure. This method was becoming uneconomical by the end of World War II and was being replaced by the solvent method, in which the oil is removed from the soybeans by means of a chemical reaction through the use of a solvent. The use of the expeller plant referred to in para *313 graph, (a) of this finding was discontinued by the then owner sometime prior to 1951, and by 1951 the plant was in a deteriorated condition.
3. The shut-down soybean oil processing plant referred to in finding 2, and the 6-acre parcel of land on which the plant was situated, were purchased by the Sicanoff Vegetable Oil Corporation on March 7, 1951, for $130,000. The ownership of the property was vested in the plaintiff at the time of its organization on April 1,1951.
4. (a) At the time when the property mentioned in findings 2 and 3 was purchased on March 7,1951, and at the time when the ownership of the property was vested in the plaintiff on April 1,1951, there was located across U.S. Highway 31 from the property an inactive military airfield owned by the defendant. This airfield near Bunker Hill had been activated originally on July 1,1942, for a naval air training station, and had then been placed in an inactive status on or about July 1, 1946. In March and April of 1951, portions of the airfield were leased by the Government to private persons for farming purposes.
(b) There was on the inactive airfield near Bunker Hill a northeast-southwest runway 5,000 feet in length. The 6-acre parcel of land referred to in findings 2 and 3 was situated to the northeast of, and in a direct line with, the northeast-southwest runway. It was a distance of 4,000 feet from the northeast end of the paved portion of the northeast-southwest runway to the 6-acre parcel of land at the nearest point. This runway was in a state of disrepair in March and April of 1951, with weeds growing through cracks in the pavement.
(c) Only piston-driven aircraft had flown to and from the military airfield near Bunker Hill during the period 1942-1946. Such aircraft had flown regularly and frequently over the property mentioned in findings 2 and 3 preparatory to landing on, or immediately after taking off from, the northeast end of the northeast-southwest runway. However, the flights of piston-driven aircraft over the property had not interfered substantially with the use and enjoyment of the property.
*314 5. (a) The plaintiff, after acquiring the property ref erred to in findings 2 and 3, embarked upon a program to enlarge the acreage and to rehabilitate the shut-down soybean oil processing plant.
(b) Two parcels of land contiguous to the 6-acre tract, one containing a little more than 5 acres and the other consisting of a fraction of an acre, were purchased for a total price of $3,800. The property, with the contiguous parcels added, is triangular in shape and contains a total of 11.393 acres. The western boundary of the enlarged property is approximately 642 feet long and extends along the right-of-way of U.S. Highway 31. The southern boundary, which runs east from and at right angles to the highway, is approximately 1,400 feet long. The northern boundary lies along the right-of-way of the Pennsylvania Railroad and is approximately 1,625 feet in length.
(c) The plaintiff’s parcel of land, subsequent to the expansion mentioned in paragraph (b) of this finding, consists of that part of Fractional Section 30, Township 26 North, Range 4 East, of the Second Principal Meridian, in Pipe Creek Township, Miami County, Indiana, described as follows: beginning at a point 1,337 feet North and 50 feet East, measured at right angles, from the Southwest comer of said Fractional Section 30, said point being on the East right-of-way line of U.S. Highway No. 31; thence East 1,407 feet to a point on the South right-of-way line of the Pennsylvania Railroad Company; thence North 65°-36' West 603 feet along the South right-of-way line of said railroad to a point; thence North 24°-24' East 40 feet to a point; thence North 65°-36' West 29 feet, more or less, to a point; thence South l°-15r West 24 feet to a point; thence North 63°-00' West 100 feet along the said South right-of-way line of said railroad to a point; thence North 50°-45' West 67 feet along said South right-of-way line to a point; thence North 67°-30' West 100 feet along said South right-of-way line to a point; thence Northwesterly along said South right-of-way line to its point of intersection with the aforementioned East right-of-way line of U.S. Highway No. 31; thence South 692 *315 feet, more or less, along said East right-of-way of U.S. Highway No. 31 to the point of beginning.
(d) The plaintiff spent approximately $52,000 on remodeling, repairing, and maintenance work in order to put the shut-down soybean oil processing plant into operating condition. Employees to operate the plant were recruited, and an experienced and competent person to manage the operation was employed. As a result of these activities, the plant was put into operation on or about September 1, 1951. Thereafter, the plaintiff spent an additional sum of approximately $18,000 for the further remodeling and repairing of the plant.
6. (a) At all times while enlarging the acreage and rehabilitating the existing expeller plant, as indicated in finding 5, it was the plaintiff’s intention to supplement the expeller plant by constructing on the premises a 100-ton plant for the extraction of soybean oil through the solvent process, to increase the existing 150,000-bushel grain storage facilities on the premises by constructing storage bins for an additional 1,000,000 bushels of grain, and to establish on the premises a depot for fats and oils by constructing storage tanks for such commodities. A competent engineering firm was retained by the plaintiff at a cost of approximately $15,000, and the personnel of this firm coordinated the preparation of plans for the expansion program mentioned in the preceding sentence. The preparation of the plans was completed in the summer of 1952. They contemplated the expenditure by the plaintiff of approximately $2,000,000 on the construction of the additional facilities. The plaintiff was in a position to obtain the necessary financing for the expansion program.
(b) The plans that were prepared for the expansion of the plaintiff’s grain storage facilities involved the construction of a concrete headhouse 206 feet high and 51 silo-type bins 120 feet high.
7. (a) At about the time when the preparation of the plans for the expansion of the plaintiff’s facilities (see finding 6) was completed, the plaintiff’s president read the fol *316 lowing item in the July 7, 1952, issue of the Peru, Indiana, Daily Tribune:
Reactivation of the Bunker Hill Naval Air station was practically assured Monday with passage by the Senate of an $18,663,000 appropriation. The House had earmarked $24,777,000 for Bunker Hill, but the Senate cut the amount by six million. Both houses of Congress were expected to approve the lower figure before adjourning later Monday.
Government officials have announced that the United States Air Force will take over and operate the base and that the Tactical Air Command will be in charge. This will mean, it was said, that jet fighter planes will be stationed at the base.
With passage of the measure, construction work will not begin until eight weeks or so later. The Air Force said some time ago it would not take over the base until Sept. 30.
(b) The newspaper item quoted in paragraph (a) of this finding was the first information that any of the plaintiff’s officers had received regarding the prospective reactivation of the Bunker Hill military airfield, located across U.S. Highway 31 from the plaintiff’s property.
8. An appropriation of more than $18,000,000 for the reactivation of the Bunker Hill military airfield was made by the Congress and approved by the President in July 1952. However, it was almost a year after that before any actual construction work was begun at the airfield to put it into operating condition.
9. Beginning on or about July 7, 1952, when he read the newspaper item quoted in finding 7(a), and continuing into December 1952, the plaintiff’s president endeavored repeatedly, but unsuccessfully, to obtain definite information regarding the defendant’s plans for the reactivation of the Bunker Hill military airfield, and the extent to which the defendant’s plans would affect the plaintiff’s own plans for the construction and operation on its property of a plant and related facilities to produce soybean oil through the solvent process. In particular, the plaintiff’s president was anxious to find out definitely — but could not do so — whether *317 the new headhouse and storage bins which the plaintiff planned to build (see finding 6 (b)) would, if constructed, project upward into the flight pattern of aircraft using the northeast-southwest runway at the Bunker Hill military airfield for landings and takeoffs.
10. Because of the uncertainty referred to in finding 9, the plaintiff in December 1952 shut down its expeller plant and discontinued the activities looking toward the construction of a solvent-process plant and related facilities on its property. The expeller operation was economically unsound, and the only hope of developing on the premises a financially successful venture for the production of soybean oil depended upon the construction of an adequate solvent-process plant and related facilities.
11. Under the date of December 30, 1952, an attorney for the plaintiff wrote a letter to Capt. Henry C. Shaid, District Public Works Officer, Ninth Naval District, Great Lakes, Illinois, and stated in part as follows:
My client is greatly concerned over the expansion program of the [Bunker Hill] Air Base by the U.S. Government, because of the proximity of the Base and the possibility of serious hazards and damages developing from the operation of aircraft, with respect to my client’s property and facilities. The present facilities include several silos and storage buildings, and my client’s expansion program would include the construction of several more silos and storage buildings. The completed plans for the expansion program of my client include a grain elevator loading tower, 240 feet in height.
* * * * *
We would greatly appreciate it if you will kindly advise me of the general plans with regard to the proposed operation of aircraft and the general development of the Air Base which could possibly have some effect upon the operation of its business by my client.
If you do not have such information, I would appreciate it if you would advise me as to the officers of [sic] officials with whom I should communicate. I would appreciate an answer as soon as possible, because my client is holding up its expansion program until it receives this information.
*318 12. The letter mentioned in finding 11 was replied to or February 16, 1953, by the Headquarters of the Air Force in Washington, D.C. The reply stated in part as follows :
As you are aware, Public Law 534 of the 82nd Congress authorizes the Secretary of the Air Force to establish and develop Bunker Hill Naval Air Station, Peru, Indiana, for use by the Tactical Air Command of the United States Air Force. The present plans of the Air Force indicate an expansion of the installation. This expansion, of course, will include the acquisition of land in the vicinity of the station. We are currently reviewing plans in this connection and as soon as a firm determination is made, we will be in a position to further advise you as to the extent and direction from the base of the additional land purchase.
With respect to plans concerning proposed operation of aircraft, no information will be available on this subject until a firm decision is reached concerning runway extension. When this decision is made, representatives of the Air Force will be happy to discuss with you the restrictions which will be necessary in this area.
13. On February 26, 1953, the plaintiff, pursuant to a request, granted to the defendant an irrevocable 30-day permit to enter upon its premises for the purpose of making an exploratory survey. In a covering letter of the same date addressed to the Office of the District Engineer, Chicago District, Army Corps of Engineers, the plaintiff stated in part as follows:
You will note we are giving you only thirty (30) days to do your surveying of the land for the following reasons.
We have been planning for over two years now and have completed a set of plans which calls for a large expansion of the present facilities. These include, for your information, a 240 foot headhouse to be used in connection.with grain storage. Since the possibility of the reopening of the Air Base has come about, we have stopped our expansion program and we also have been forced to shut down our present operations due to conditions arising of being caught in the middle of an expansion program and the old plant. This has caused a severe economic hardship on this corporation and due to the daily loss which we are incurring at the plant, it *319 is impossible for us to go beyond thirty days on any matter concerning the plant.
14. On June 1,1953, there was inaugurated at the Bunker Hill military airfield a huge construction program that involved the construction of many buildings and facilities, including the rehabilitation and extension of the primary northeast-southwest runway (although the actual construction work on this runway was not begun until the summer of 1954 (see finding 23)).
15. Under the date of July 7,1953, the Office of the District Engineer, Chicago District, Corps of Engineers, wrote a letter to the plaintiff, stating in part as follows:
The United States Air Force has requested that this office furnish them with a preliminary estimate of the value of avigation easements at the Bunker Hill Naval Air Station. * * *
This approach surface begins at a line 1000 feet northeast of the end of the NE-SW runway, extending upward and outward at a 1 to 50 glide angle. Your property is located approximately 3200 feet from the beginning of said approach surface which passes over your property at a point about 14 feet above the highest tank and about four feet below the top of the smoke stack located adjacent to said tanks.
This office will recommend that the smoke stack remain in its present status with warning lights to be placed thereon.
The proposed avigation easement will not affect the present facilities but all future construction will be limited to an elevation not exceeding that of the glide angle as it extends over your property.
This office would greatly appreciate your opinion of the value of such an avigation easement as it affects the property of the Mid-States Fats and Oils Corporation * * *.
16.The plaintiff replied under the date of July 14, 1953, to the letter mentioned in finding 15, and stated in part as follows:
The Mid-States Fats and Oils Corporation believes that the value of said damages to Mid-States Fats and Oils Corporation, together with said avigation easement is $495,000.00.
*320 17. Under the date of September 25, 1953, the plaintiff wrote a letter to the Chief of the Eeal Estate Division, Office of the District Engineer at Chicago, and stated as follows:
We have not received a reply to our letter of July 14th with regard to damages to the Mid-States fats [sic] and Oils Corporation, at their plant at Bunker Hill, Indiana, including value of the granting of an avigation easement, resulting from the expansion and development of the Bunker Hill Naval Station.
In view of the serious damage to the operation of our plant and the blocking of any expansion program, we feel that we are entitled to an early reply.
Additional losses have been piling up because we cannot make any plans, particularly since we were informed of the plans for the development of the approach surface. These plans place all our facilities in jeopardy.
It appears, of a certainty, that our construction program which would entail the increasing of the height of some facilities and structures must be dropped.
We would appreciate a reply within five days.
18. Under the date of September 30, 1953, the Office of the District Engineer at Chicago replied to the plaintiff’s letters of July 14 and September 25, 1953 (see findings 16 and 17), and stated in part as follows:
* * * [T]his office has not been informed of any definite action to be taken relative to expansion at this air station, and we have not been authorized to curtail any construction program which you had planned, or may plan, at this location.
19. On March 31, 1954, the plaintiff’s president wrote the following letter to the Chief of the Eeal Estate Division in the Office of the District Engineer at Chicago:
We have been patiently waiting to hear from your office regarding disposition of the matter of the damage and injuries suffered by the Mid-States Fats and Oils Corporation by reason of the development of the Air Base at Bunker Hill, Indiana.
There have appeared in our local newspapers many articles indicating a great deal of activity and progress in the plans for this air base or station.
We supplied to your office the necessary facts as to the damage many months ago and there was some indication that we would hear from your office as to what the *321 government intends to do, but to date we have received no definite reply.
The damage to our business has been increasing constantly, and the ability to continue to carry on appears now to be doubtful. Our hands have been tied as to the making of any future plans, and with the ever increasing losses, it appears that this corporation will be forced into bankruptcy.
We will appreciate a reply.
20. In a letter dated April 14,1954, the Chief of the Real Estate Division in the Office of the District Engineer at Chicago informed the plaintiff’s president in part as follows:
This office has no further information regarding future intention of the Government relative to avigation easements over your property which will restrict any construction program you may have planned, upon your property.
If at some future date such restriction easements are authorized, this office will promptly notify you of such action.
21. (a) On or about April 23, 1954, the military airfield at Bunker Hill was reactivated and named the Bunker Hill Air Force Base. Jurisdiction over the base was assigned to the Tactical Air Command of the Air Force.
(b) At all times since the reactivation of the base, the Bunker Hill Air Force Base has been a permanent base of the Air Force.
22. Under the date of June 24, 1954, the plaintiff wrote a letter to an official of the Department of Defense in Washington, D.C., stating in part as follows:
We have been trying for several years now to receive an answer from the Government regarding disposition of out plant at Peru. As you know from the file on our past letters to the proper authorities, that since we have been stopped in our expansion and modernization plans, this corporation at Peru has lost tremendous sums of money and is on the verge of bankruptcy due to the refusal of the Government to take definite action regarding our situation at Peru, Indiana.
We hope you realize the seriousness of our situation and take immediate steps to rectify the terrible burden the Government is placing on this corporation.
*322 23. As part of the large-scale construction program at the Bunker Hill Air Force Base (see finding 14), work was begun on August 26, 1954, to rehabilitate and extend the primary northeast-southwest runway. This involved the construction of a 10,000-foot concrete runway, with an asphalt overrun at each end of the runway. The extension of the runway from the original 5,000 feet to a total of 10,000 feet resulted from the addition of 5,000 feet onto the southwest end of the runway. The northeast end of the runway, which was the end nearest to the plaintiff’s property, was not extended.
24. Under the date of November 17, 1954, the plaintiff wrote a letter to the Commanding General of the Tactical Air Comand, stating in part as follows :
Our plant operation has come to a standstill for the last two years due to your reactivation because we had spent thousands of dollars on plans to expand and build a whole new plant on the spot which would entail heights of our headhouses and grain elevators three times as high as they are now and if you want easements on our present heighth, it would be impossible for us to go ahead and build new facilities three times their size. The plant operation is no good unless we could build the new plant. We have continued to lose extremely large sums of money until we have reached a point now where we must make a decision as to what we are going to do.
* $ $ $ $
You are about as high as we can go in getting this settled, so we would appreciate an answer in the near future.
25. The Commanding General of the Tactical Air Command replied on November 26,1954, to the letter referred to in finding 24, and stated in part as follows:
The location of an air base is based on the requirements of national defense. However, in the design and operation of an Air Force Base, the impact on civil economy is given serious consideration, and every effort is made to reduce this impact in every possible manner. At Bunker Hill Air Force Base, the approach to the NE-SW runway (Instrument Runway) was changed from the NE end to the SW end to minimize hazards in the vicinity of your plant.
*323 A primary safety requirement is to provide an approach zone in which no object extends into the airspace required by an aircraft to make a safe landing or take-off. This space begins 1000 feet from the end of the runway and rises 1 foot for each 50 feet horizontal distance. In all instances where the approach zone is not protected by a local zoning ordinance, the Air Force acquires avigation easements for this purpose. Tactical Air Command, recognizing its responsibilities, requested authorization and funds for procurement of an avigation easement in the area of your property. Congress, in July 1954, authorized and funded such procurement.
Directives for procurement of real estate so authorized are presently being processed by Headquarters, United States Air Force. Directive in this instance has not been released; however, it is anticipated that such action will be taken in the near future.
26. On January 28, 1955, the plaintiff again wrote to the Commanding General of the Tactical Air Command, and stated in part as follows:
This is in reference to your letter of November 26, 1954, regarding reactivation of the Bunker Hill Air Force Base. We have not received that first word regarding our situation at Bunker Hill. Your letter stated along with other information which we knew at that time, that some action was to have been forthcoming.
Two more months have gone by with severe additional monetary losses to our plant at Bunker Hill and we feel that we can wait no longer. Unless we get a satisfactory answer from you, or someone with authority, regarding our situation, we will be forced to take steps to rectify this gross injustice.
$ ‡ ‡ $
Unless we receive a reply from you by February 15, 1955, we will then be compelled to take further action to protect our rights and interest.
27. The first military aircraft assigned to the reactivated Bunker Hill Air Force Base were the F-94 Starfire jet and the F-86 Sabre jet. These planes were permanently assigned to the base in October 1955. Since that time, most of the planes assigned to the base have been of the jet aircraft type, and have included fighters, bombers, and tankers. All jet aircraft using the facilities of the Bunker Hill Air Force *324 Base have taken off from or landed on the northeast-southwest runway.
28. On November 22, 1955, Chicago counsel for the plaintiff wrote to the Office of the District Engineer at Chicago and stated in part as follows:
We represent the Mid-States Fats and Oils Corporation of Peru, Indiana. Their plant is in the vicinity of the Bunker Hill Air Base. We understand that the planning report which your office recently forwarded to Washington, in connection with the reactivation of this base, contains a recommendation that an avigation or clearance easement over their plant be acquired.
^ ❖
As we interpret Mr. Shaid’s letter [see finding 15], your office proposed the acquisition of a clearance easement at a height of 64 feet above the ground with a proviso that warning lights be placed on an existing 68 ft. chimney.
We would appreciate being advised whether the above is an accurate interpretation of the easement which your office has recommended be acquired over the Mid-States plant. If it is not, please advise us as to the nature of your recommendation in this regard.
29. The Chief of the Beal Estate Division in the Office of the District Engineer at Chicago replied on December 23, 1955, to the letter mentioned in finding 28, and stated in part as follows:
You are aware that future planning may require an approach zone clearance easement overland and facilities of the Mid-States Fats and Oils Corporation, a corporation represented by your firm. This matter is being studied by higher authority and, therefore, this office is without a procedural directive.
‡ ‡ ‡
The clearance zone is a plane extending from the top elevation of the runway surface extended 1000 feet beyond the actual runway, one foot in elevation for each 50 feet of distance, the zero elevation as indicated above being the runway surface elevation extended. Actually, clearance of your client’s holdings will depend on the elevation of any structures or objects above the surface elevation of the end of the runway.
*325 30. On May 4, 1956, the plaintiff wrote a letter to the Chief of the Keal Estate Division in the Office of the District Engineer at Chicago, and stated hi part as follows:
This letter is being written to you * * * to confirm our understanding that the government has now abandoned its intention to acquire * * * an easement over our plant. Such information was given our Chicago counsel * * * by your Mr. B. A. Fisher, by telephone, on April 6,1956.
In view of the information received from Mr. Fisher, we now propose to go ahead with our construction plans which have been suspended for approximately four years. _ For your information, this will involve the construction of a “head house” and power plant smokestack to a height of approximately one hundred feet above the height of these buildings at the existing plant. Storage elevators also will be enlarged and their height increased substantially. It is proposed that this new construction will be commenced m approximately thirty days.
31. The Chief of the Beal Estate Division in the Office of the District Engineer at Chicago replied on May 8, 1956, to the plaintiff’s letter mentioned in finding 30. The reply stated in part as follows:
It is noted in par. 2 of your letter that you state it is your understanding that the “* * * government has now abandoned its intention to acquire such an easement over our plant”. This information is somewhat in error insofar as this office is aware, as the U.S. Air Force has recently requested the preparation of a report with respect to your property, which is now under consideration by that Headquarters.
It is anticipated that this office will be advised promptly as to whatever action the Government will take in respect to the proposed clearance easement, in which event this office will contact you directly.
32. On June 14,1956, the Honorable Charles B. Brownson, a Member of Congress from the 11th District of Indiana, forwarded to the plaintiff a copy of a letter which he had received from the Headquarters of the Air Force in Washington, D.C., under the date of June 11, 1956, and which stated in part as follows:
The Air Force has not abandoned its plans to acquire clearance easements over the [plaintiff’s] property in *326 question. The Corps of Engineers, Department of the Army, which acts as the real estate agency for the Air Force on such matters^ is curently re-evaluating the cost estimate for these easements. Upon receipt of the revised estimate of cost, we will then be in a position to determine what action will be in the best interest of the Government.
33. In a letter dated July 17, 1956, the Chief of the Neal Estate Division in the Office of the District Engineer at Chicago informed the plaintiff’s Chicago counsel in part as follows:
The Office, Chief of Engineers, U.S. Army, recently recommended to the Chief of Staff, Headquarters, U.S. Air Force, that, in event a military requirement existed, condemnation proceedings be filed for acquisition of a clearance, easement over the Mid-States Fats and Oils Corporation holdings affected. This action was recommended to obviate possible construction of future flight hazards on the lands affected. It was understood, of course, that the matter of value in case of the need for any taking would have to be resolved.
The final decision as to whether or not the Government will seek to acquire a clearance easement rests with the Secretary of Defense. In order that the Secretary of Defense may consider the problem and make a determination, the Air Force has directed this office to have prepared a comprehensive appraisal. It is expected that such appraisal can be commenced within the next two weeks. Tour indulgence and cooperation in permitting the appraisal to be made will be much appreciated.
34. In response to a letter from the Honorable John Y. Beamer, a Member of Congress from the 5th District of Indiana, stating that the plaintiff “would like to have some definite understanding from the Air Force in regard to their requirements” with respect to the plaintiff’s property, the Headquarters of the Air Force in Washington, D.C., wrote to Mr. Beamer on September 7, 1956, and stated in part as follows:
The Air Force originally planned to acquire clearance easements over the Corporation’s property and submitted the project to the Office, Secretary of Defense, for necessary approval. However, this proposed acquisition was *327 disapproved on tbe basis that the estimated costs appeared too high in relation to the costs of acquiring other easement interests in that area.
The Air Force has not abandoned its plans to acquire clearance easements over the property in question. The Corps of Engineers, Department of the Army, which acts as the real estate agency for the Air Force on such matters, is currently reevaluating certain cost figures concerning this problem. Upon receipt of the revised estimate of cost, we will then be in a position to determine what action will be in the best interest of the Government.
35. Jurisdiction over the Bunker Hill Air Force Base was transferred from the Tactical Air Command to the Strategic Air Command of the Air Force in September 1957.
36. (a) The northeast-southwest runway at the Bunker Hill Air Force Base was extended again beginning in June of 1958. The southwest end of the runway was extended an additional 2,500 feet, so that the total length of the paved portion of the runway thereafter was 12,500 feet. The northeast end of the runway has never been extended in the direction of the plaintiff’s property, and the distance from that end of the runway to the plaintiff’s property at the nearest point has continued to be 4,000 feet.
(b) Only the northeast-southwest runway at the Bunker Hill Air Force Base has been used by jet aircraft operating to or from that base since its reactivation.
37. (a) Although no statistical data are available with respect to the number of flights that were made by military aircraft of the defendant over the plaintiff’s property during the period October 1955-December 1956, the evidence in the record establishes that a substantial number of such flights occurred during each month of the period as planes approached to land from the northeast on, or took off toward the northeast from, the northeast-southwest runway at the Bunker Hill Air Force Base. For the period, beginning with January 1957 and extending through January 1961, the following table shows the approximate number of flights per month by military aircraft of the defendant over the plain *328 tiff’s property preparatory to landing from the northeast on, or immediately after taking off toward the northeast from, the northeast-southwest runway at the Bunker Hill Air Force Base:

Month. Mights

1957 January_1, 789
February_2, 553
March_3, 389
April_3, 652
May_2,180 June_2, 859
July_1, 526
August_1, 755
September_ 872
October_1,425
November_1, 456
December_1,213
1958 January_ 761
February_1,153
March_1,183
April-1,102
May_1,939
June_ 844
July_1, 501
August_1,667
September_1, 711
October_2,163
November_1,195
December_1, 951

Month Mights

1959 January_1,197
February_2, 219
March_3,122
April_3, 994
May-3,286
June_3,177
July_3,769
August_3,695
September_4, 336
October_3, 385
November___3,501
December_3,127
1960 January_2, 698
February_2, 708
March_3, 889
April_4, 843
May-4, 519
June_3,361
July_4,104
August_4, 832
September_4, 852
October_4, 873
November_5, 821
December_5, 731
1961 January_3,887
(b) A majority of the flights referred to in paragraph (a) of this finding involved landings from the northeast on the northeast-southwest runway at the Bunker Hill Air Force Base.
38. (a) Most of the military aircraft of the defendant that have flown over the plaintiff’s property during the period since October 1, 1955, as indicated in finding 37, have been jet aircraft.
(b) The following types of military jet aircraft of the defendant have regularly and frequently flown over the plaintiff’s property at least part of the time during the period since October 1, 1955, in connection with landings on *329 or takeoffs from the northeast end of the northeast-southwest runway at the Bunker Hill Air Force Base:

39. Beginning on or about October 1, 1955, and continuing up to the present time, military jet aircraft of the defendant have regularly and frequently flown over the plaintiff’s property at altitudes of less than 500 feet above the surface of the ground immediately prior to landing from the northeast on the northeast-southwest runway at the Bunker Hill Air Force Base, or immediately after taking off toward the northeast from the northeast-southwest runway. Many of these aircraft, especially those preparing to land from the northeast on the northeast-southwest runway, have regularly and frequently flown over the plaintiff’s property at altitudes as low as 167 feet above the surface of the ground; and some aircraft have occasionally flown over the plaintiff’s property at altitudes lower than 167 feet above the surface of the ground.
40. When military jet aircraft of the defendant fly over the plaintiff’s property immediately after taking off toward the northeast from, or immediately prior to landing from the northeast on, the northeast-southwest runway at the *330 Bunker Hill Air Force Base, they make a loud, whining noise of about 100 decibels on the average and up to 135 decibels on occasion, and they cause great turbulence in the air. These conditions have interfered substantially with the use and enjoyment of the plaintiff’s property since on or about October 1,1955.
41. On or about October 1, 1955, the defendant took a perpetual easement of flight for its aircraft over the plaintiff’s property at an elevation of 167 feet and higher above the surface of the ground.
42. (a) Just before October 1955, when regular and frequent flights by the defendant’s jet aircraft at relatively low altitudes over the plaintiff’s property began to interfere substantially with the use and enjoyment of the property, the highest and best use of such property was for a solvent-process soybean oil plant, with related facilities, of the sort planned hy the plaintiff (see finding 6).
(b) The fair market value of the plaintiff’s property just before October 1955 for the use mentioned in paragraph (a) of this finding was $200,000.
43. (a) The highest and best use of the plaintiff’s property just after regular and frequent flights by the defendant’s jet aircraft at relatively low altitudes over the property began to interfere substantially with the use and enjoyment of the property on or about October 1,1955, was for a solvent-process soybean oil plant, with related facilities. However, such a venture would have been more difficult and expensive after about October 1,1955, than it would have been prior to that date, because of the noise and vibration resulting from regular and frequent flights of the defendant’s jet aircraft at relatively low altitudes over the property, and because it was no longer permissible to construct on the premises a head-house with the efficiency and economy in operation that would have been derived from the 206-foot height of the concrete headhouse planned by the plaintiff.
(b) The fair market value of the plaintiff’s property for the use mentioned in paragraph (a) of this finding just after regular and frequent flights of the defendant’s jet aircraft at relatively low altitudes over the property began to interfere *331 substantially with the use and enjoyment of the property was $80,000.
44. (a) In August of 1960, the plaintiff started to construct a frame structure 40 feet high, and with other measurements of 11 feet by 14 feet, on top of the existing headhouse, which would have extended the height of the headhouse from 67 feet to 107 feet.
(b) On August 24, 1960, the defendant instituted a condemnation case entitled United States v. 11.26 Acres of Land, more or less, situate in Miami County, State of Indiana, and Mid-States Fats and Oils Corporation, Civil No. 2767, in the United States District Court for the Northern District of Indiana, South Bend Division, and filed a declaration of taking in that case. The case was instituted to acquire over the plaintiff’s property a clearance easement commencing at an elevation of approximately 62% feet above the surface of the ground at the southern boundary of the plaintiff’s property, and then extending to the northern boundary of the property with a gradual increase in elevation of 1 foot for each 50 feet of horizontal distance, so that the easement begins at an elevation of approximately 92 feet above the ground along the northern boundary of the plaintiff’s property. In accordance with the terms of the taking in the condemnation proceeding, the defendant is vested with a perpetual easement to keep any structures or trees from being constructed or growing above the plane representing the lower elevation of the clearance easement.
(c) After acquiring the clearance easement, the defendant proceeded to remove the new construction from the top of the plaintiff’s headhouse. The defendant also lowered a smokestack on the plaintiff’s property to the extent of 6 feet by taking that much off the top of the smokestack, since it had previously intruded 6 feet into the airspace affected by the clearance easement.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and *332 from tbe United States tbe sum of one hundred twenty thousand dollars ($120,000), plus an amount computed at tbe rate of four (4) percent per annum on $120,000 from October 1, 1955, to the time of payment, all as just compensation for tbe taking of tbe plaintiff’s property.
It is further concluded that tbe United States is vested with a perpetual easement of flight for airplanes at an elevation of one hundred sixty-seven (167) feet and higher above the ground over that part of Fractional Section 30, Township 26 North, Range 4 East, of the Second Principal Meridian, in Pipe Creek Township, Miami County, Indiana, described as follows: beginning at a point 1,337 feet North and 50 feet East, measured at right angles, from the Southwest corner of said Fractional Section 30, said point being on the East right-of-way line of U.S. Highway No. 31; thence East 1,407 feet to a point on the South right-of-way line of the Pennsylvania Railroad Company; thence North 65°-36' West 603 feet along the South right-of-way line of said railroad to a point; thence North 24°-24' East 40 feet to a point; thence North 65°-36' West 29 feet, more or less, to a point; thence South 1°-15' West 24 feet to a point; thence North 63°-00' West 100 feet along the said South right-of-way line of said railroad to a point; thence North 50°-45' West 67 feet along said South right-of-way line to a point; thence North 67°-30' West 100 feet along said South right-of-way line to a point; thence Northwesterly along said South right-of-way line to its point of intersection with the aforementioned East right-of-way line of U.S. Highway No. 31; thence South 692 feet, more or less, along said East right-of-way of U.S. Highway No. 31 to the point of beginning. The plaintiff will execute a deed conveying such easement to the United States in fee simple.

 We are dealing with the situation that prevailed in about October 1955, when the only taking by the Government was an easement of flight at an elevation of 167 feet and higher above the ground. The clearance easement at a lower elevation was not taken by the Government until August 1960.

 This aircraft also has two conventional engines.