**A. J. HODGES INDUSTRIES, INC., and Union Producing Company**

v.

**The UNITED STATES.**

**No. 113–62.**

United States Court of Claims.
Jan. 21, 1966.

Billy R. Pesnell, Shreveport, La., attorney of record, for plaintiff. Hargrove, Guyton, Van Hook & Ramey, Shreveport, La., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 45(a) (now Rule 57(a)) to Trial Commissioner Mastin G. White, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 17, 1964. Plaintiffs have excepted to the opinion and certain of the findings of fact. Defendant elected to submit the case on the commissioner's report without filing exceptions or brief. The case has been submitted upon oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the trial commissioner, with the deletion of one sentence, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Plaintiffs are, therefore, entitled to recover and judgment is entered for them in the sum of sixty-one thousand one hundred dollars ($61,100), plus an amount computed at the rate of four percent (4%) per annum on $61,100 from August 1, 1958, to the time of payment, all as just compensation for the taking of an easement of flight over their property, contingent upon the plaintiffs' executing and delivering to the defendant of a deed conveying a perpetual easement of flight in the airspace over the 554.744 acres referred to in the final sentence of finding 2(a), beginning at an elevation of 124 feet from the surface of the ground and extending upward indefinitely, and authorizing the defendant to utilize the easement for the operation of B–52 jet bombers and other aircraft causing similar or less interference with the use and enjoyment of the subjacent property.

OPINION OF COMMISSIONER

PART I

The plaintiffs in this case are two corporations doing business in the State of Louisiana. They jointly assert a claim for the alleged taking by the defendant of a so-called avigation easement in the airspace above a tract of land situated about 4 miles southeast of Bossier City, Louisiana, and consisting of 566.324 acres. The property, at all times material to this litigation, has been used for agricultural purposes by lessees of the plaintiffs.

The defendant concedes that it has taken an avigation easement in the airspace over the land in question, but contends that the plaintiffs' claim is barred by the statute of limitations.

The courts have held that when regular and frequent flights by Government-owned aircraft over privately owned land at altitudes of less than 500 feet from the surface of the ground constitute a direct, immediate, and substantial interference with the use and enjoyment of the property, there is a taking by the Government of an avigation easement, or easement of flight, in the airspace over the property, and that this taking is compensable under the Fifth Amendment to the Constitution. United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); Bacon v. United States, 295 F.2d 936, 155 Ct. Cl. 441, 443 (1961). However, a claim for such a taking is barred by the statute of limitations unless the claim is asserted by the filing of a petition with this court "within six years after such claim first accrues" (28 U.S.C. § 2501 (1958)).

Therefore, the principal question presented for decision in this case is whether the plaintiffs' claim, or any part of it, first accrued more than 6 years prior to the filing by the plaintiffs on their petition on April 16, 1962.

The plaintiffs' property adjoins Barksdale Air Force Base, a large and busy installation of the United States Air Force. Since about February 1951, the base has been under the control of the Strategic Air Command. The south boundary line of the base and the north boundary line of the plaintiffs' land are contiguous for a distance of approximately 1 mile.

Flying activities began at Barksdale Air Force Base in November 1932. How-

ever, the evidence in the record does not show that such activities had any significant relationship to the plaintiffs' property until the completion of a northwest-southeast runway at Barksdale. This runway, numbered 14, was originally completed in August 1943 to a length of 10,156 feet. Upon its completion, runway 14 became—and it still is—the main runway at Barksdale. After the advent of jet aircraft at Barksdale beginning in November 1948, such aircraft have used runway 14 for all takeoffs and landings.

At the time of the original completion of runway 14 in August 1943, the north boundary line of the plaintiffs' property was approximately 3,440 feet from the southeast end of the runway, and the projected center line of the runway bisected the plaintiffs' land for a distance of more than a mile.

During the period beginning with the completion of runway 14 at Barksdale Air Force Base in August 1943 and continuing until sometime in December 1956, aircraft of the defendant approaching the base from the southeast for the purpose of landing on the southeast end of runway 14 regularly and frequently flew through the airspace above the plaintiffs' property at altitudes lower than 500 feet from the surface of the ground. Such aircraft, when entering the airspace above the plaintiffs' property at the southern boundary of the property, were generally at an altitude of about 456 feet above the surface of the ground, and they gradually descended at a 2.5-degree glide slope until they were about 194 feet above the surface of the ground by the time they left the airspace over the plaintiffs' property at the northern boundary of the property.

The aircraft mentioned in the preceding paragraph included the following types: B–25 and B–26 twin-engine propeller-driven bombers (from August 1943 until sometime in 1947); B–45 4-engine jet bombers (from November 1948 until a time which is not clearly reflected by the evidence in the record but which was probably about January 1951); C–124 4-engine propeller-driven cargo aircraft (from December 1949 until December 1956, and thereafter); RB–45 4-engine jet reconnaissance bombers (from February 1951 until about April 1953); KB–29 4-engine propeller-driven tankers (from February 1951 until September 1953); B–29 4-engine propeller-driven bombers (from October 1951 until January 1954); B–47 6-engine jet bombers (from September 1953 until December 1956, and thereafter); and KC–97 4-engine propeller-driven tankers (from August 1953 until December 1956, and thereafter).

During the period now under consideration, August 1943–December 1956, aircraft of the defendant taking off from runway 14 at Barksdale toward the southeast intruded regularly and frequently into the airspace above the plaintiffs' property immediately after the takeoffs. However, the evidence in the record does not show at what altitudes such aircraft flew when passing through the airspace above the plaintiffs' property, except for the KC–97's, the C–124's, and the B–47's. The KC–97's and C–124's were frequently at an altitude of about 300 feet from the surface of the ground when they entered the airspace above the plaintiffs' property at the northern boundary of such property immediately after taking off toward the southeast from runway 14. B–47's were generally at an altitude of at least 500 feet from the surface of the ground when they entered the airspace above the plaintiffs' property immediately after taking off toward the southeast from runway 14. In each instance, an aircraft would continue to climb as it passed through the airspace above the plaintiffs' property.

█ Regular and frequent flights by Government-owned aircraft through the airspace over privately owned land at low altitudes do not constitute the taking of an avigation easement unless such flights interfere substantially with the use and enjoyment of the land. Adaman Mutual Water Co. v. United States, 181 F.Supp. 658, 143 Ct.Cl. 921, 923 (1958); Mid-States Fats and Oils Corp. v. United States, 159 Ct.Cl. 301, 304 (1962). In

this connection, it is pertinent to observe that the record is devoid of evidence indicating that flights by the defendant's aircraft, other than the B–47's at low altitudes over the plaintiffs' property during the period August 1943–December 1956 interfered substantially with the use and enjoyment of the property. Consequently, except for the B–47's, flights by the defendant's aircraft over the plaintiffs' property during the period now under consideration must be disregarded in determining whether the defendant took an avigation easement in the airspace over the plaintiffs' property during such period.

With respect to the B–47 jet bombers, the evidence shows that this type of aircraft first began to operate regularly at Barksdale Air Force Base in September 1953. At that time, the 301st Bomb Wing of the Strategic Air Command was the major tactical organization assigned to Barksdale. From the time of its assignment to Barksdale in February 1951 until the summer of 1953, it had been equipped with RB–45 4-engine jet reconnaissance bombers, as well as other aircraft. During the period April–July 1953, this wing was in the process of replacing the RB–45's with B–47 jet bombers. By September 1953, the wing had 46 B–47's. This wing operated B–47's at Barksdale until December 1956, and also thereafter for a time.

The 376th Bomb Wing of the Strategic Air Command, which was assigned to Barksdale in October 1951, was equipped with B–47 jet bombers in the early part of 1954. At the end of March 1954, this wing had 29 B–47's; and by the end of May 1954, it had 48 B–47's. The 376th Bomb Wing continued to operate B–47's at Barksdale until December 1956, and also thereafter for a time.

The evidence in the record is meager concerning the effect of regular and frequent flights by B–47's over the plaintiffs' property at altitudes as low as 194 feet from the surface of the ground during the period from September 1953 until December 1956. The pertinent information on this point merely shows that

B–47's flying over the plaintiffs' property at low altitudes were noisy, that such flights caused some vibration to persons and objects on the ground, and that when cattle previously unaccustomed to such flights were brought on the property, they were for a time made nervous by B–47 overhead flights.

If this were a case of first impression concerning low flights by B–47's meager evidence of the sort just mentioned would probably be insufficient to show such interference with the use and enjoyment of the subjacent land as to constitute the taking of an avigation easement by the defendant in the airspace over the plaintiffs' property during the period that is now under consideration. However, this court in previous cases has dealt with the matter of regular and frequent flights by B–47 jet bombers over privately owned land at altitudes of less than 500 feet, and it has held in each case that such flights constituted a taking of an avigation easement over the subjacent land. Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269 (1958); Dick v. United States, 169 F.Supp. 491, 144 Ct. Cl. 424 (1959); Jensen v. United States, 305 F.2d 444, 158 Ct.Cl. 333 (1962).

 I believe that, in the light of the decisions just cited, the limited evidence in the record relative to the effect of regular and frequent low flights by B–47's over the plaintiffs' property on the use and enjoyment of the property can be regarded as sufficient to establish the taking by the defendant of an avigation easement in the airspace over the plaintiffs' property. The taking occurred in September 1953, when the defendant began to operate B–47's regularly and frequently over the plaintiffs' property at low altitudes with the intention of continuing such flights indefinitely. Adaman Mutual Water Co. v. United States, supra, 143 Ct.Cl. at p. 924. The avigation easement began in the airspace at the lowest elevation regularly and frequently affected by the defendant's intrusions, or 194 feet from the surface of the ground, and extended upward; and the easement pertained to the airspace

over the entire tract of land. Matson v. United States, 171 F.Supp. 283, 145 Ct. Cl. 225 (1959).

■ Of course, a claim for the taking in September 1953 of the avigation easement referred to in the preceding paragraph was barred by the 6-year statute of limitations when the plaintiffs filed their petition on April 16, 1962. This conclusion does not, however, necessarily require the dismissal of the plaintiffs' petition.

## PART II

In November 1955, runway 14 was extended on the southeast end for an additional distance of 1,600 feet. Since November 1955, runway 14 has been 11,756 feet in length, and the southeast end of the runway has been approximately 1,840 feet from the north boundary line of the plaintiffs' property. The projected center line of the runway has continued to bisect the plaintiffs' land for a distance of more than a mile.

In connection with the November 1955 extension of runway 14, the defendant acquired by condemnation on May 8, 1956, a clearance easement over 223.13 acres of the plaintiffs' land. The 223.13-acre parcel is situated directly to the southeast of the southeast end of runway 14, and the parcel is bisected by the projected center line of the runway.

After acquiring the clearance easement referred to in the preceding paragraph, the defendant in August 1956 cut down and removed approximately 178 pecan trees from the area affected by the clearance easement. A number of these trees, approximately 60 to 75 feet in height, were situated near the boundary line between the plaintiffs' land and Barksdale Air Force Base. As compensation for the clearance easement and the removal of the pecan trees, the plaintiffs received $81,891.25, plus interest at the rate of 6 percent per annum on the portion of the award that had not been deposited with the court at the time of the taking.

During the period beginning sometime in December 1956—after the removal of the pecan trees from the plaintiffs' property—and continuing until the present time, aircraft of the defendant approaching Barksdale Air Force Base from the southeast for the purpose of landing on the southeast end of runway 14 have regularly and frequently flown through the airspace above the plaintiffs' property at altitudes about 70 feet lower than the 456-to-194-foot descending plane mentioned in part I of this opinion. During this later period, the aircraft preparing to land on the southeast end of runway 14 have generally been at an altitude of about 386 feet from the surface of the ground when entering the airspace above the plaintiffs' property at the southern boundary of the property; and then, after a gradual descent at a 2.5-degree glide slope, they have been at an altitude of about 124 feet from the surface of the ground when they have emerged from the airspace above the plaintiffs' property at the northern boundary of the property.

For a substantial period of time beginning with December 1956, the aircraft mentioned in the preceding paragraph included B–47's. Both the 301st Bomb Wing and the 376th Bomb Wing of the Strategic Air Command were still at Barksdale, and they were equipped with B–47's, as well as other aircraft.

■ For the reasons stated earlier in this opinion, it is concluded that, because of the lower flights by B–47's over the plaintiffs' property beginning in December 1956, there was an additional taking by the defendant in December 1956 of an avigation easement in the airspace over the plaintiffs' land, beginning at an elevation of 124 feet from the surface of the ground and extending upward to the portion of the airspace affected by the earlier avigation easement. This taking occurred within the 6-year period immediately preceding the filing of the plaintiffs' petition on April 16, 1962.

■■ The measure of damages for the taking of an easement by the Government over privately owned land is the difference between the fair market value of the land just before the easement was taken and the fair market value of the

land just after the easement was taken. Federal Real Estate and Storage Co. v. United States, 79 Ct.Cl. 667, 682 (1934); Mid-States Fats and Oils Corp., supra, 159 Ct.Cl. at p. 310. The record in the present case does not contain any evidence showing that the fair market value of the plaintiffs' land just after the taking of the additional avigation easement by the defendant in December 1956 was any less than the fair market value of the property had been just before the additional avigation easement was taken. Since the plaintiffs have the burden of proving that they sustained actual damages (Severin v. United States, 99 Ct.Cl. 435, 443 (1943), cert. denied 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944)), it must be concluded that there was no diminution in the value of the land by virtue of the taking of this additional easement of flight.

 Consequently, there is no basis for making an award to the plaintiffs with respect to the taking of the additional avigation easement in December 1956.

### PART III

The 376th and 301st Bomb Wings, previously mentioned in parts I and II of this opinion, were transferred from Barksdale Air Force Base in December 1957 and April 1958, respectively. Thereafter, the operation of B–47 jet bombers by these units at Barksdale was no longer of significance from the standpoint of the present case.

On March 1, 1958, however, the 4238th Strategic Wing of the Strategic Air Command was organized at Barksdale. Beginning in August 1958 and continuing until the present time, B–52 8-engine jet bombers have been assigned to and regularly operated at Barksdale. The B–52 is almost twice as large as the B–47; and the engines of the B–52 develop approximately twice as much thrust as the engines of the B–47. From September 1958 until the present time, KC–135 4-engine jet tankers have also been assigned to and regularly operated at the base.

The B–52's and the KC–135's, when approaching Barksdale Air Force Base from the southeast for the purpose of landing on the southeast end of runway 14, have generally flown at about the same altitudes as other aircraft landing on the southeast end of runway 14 subsequent to the extension of that runway and the removal of the pecan trees from the plaintiffs' property. That is to say, the B–52's and the KC–135's, when preparing to land on the southeast end of runway 14, have generally entered the airspace above the southern portion of the plaintiffs' property at an altitude of about 386 feet from the surface of the ground; they have gradually descended at a 2.5-degree glide slope; and they have been at an altitude of about 124 feet from the surface of the ground when they have emerged from the airspace above the plaintiffs' property at the northern boundary of the property.

On takeoffs toward the southeast from runway 14, the KC–135's have frequently been at an altitude of about 375 feet from the surface of the ground upon entering the airspace above the northern portion of the plaintiffs' property. On the other hand, the B–52's are high-performance aircraft, and they have generally been at an altitude of about 1,000 feet from the surface of the ground upon entering the airspace above the northern portion of the plaintiffs' property immediately after taking off toward the southeast from runway 14.

There is no evidence in the record concerning the effect of flights by KC–135's at low altitudes over the plaintiffs' property. With respect to low flights by the B–52's, however, the evidence shows that this aircraft, in operation, is the noisiest of all the aircraft mentioned in any part of this opinion; that it creates such turbulence as it flies through the air that heavy vibration is caused to persons and objects on the ground in the vicinity; and that, when the wind is right, smoke and the scent of burning fuel drift from the engines of the aircraft to the ground. The evidence further shows that cattle on the plaintiffs' property, previously un-

accustomed to B–52 flights overhead, have been stampeded by B–52's flying low over the property, although cattle become accustomed to such overhead flights within 4 or 5 weeks after being brought on the property. In addition, the noise of a B–52 flying low above the plaintiffs' property makes conversation on the ground below impossible. Even a person who is yelling at such a time cannot be understood. Also, the flight of a B–52 above the plaintiffs' property at a low altitude causes an interruption of farm work while the aircraft is overhead, as the workmen must use their hands to protect their ears at such a time.

Thus, although the evidence in this record shows that the B–52's, after their advent at Barksdale Air Force Base in August 1958, have not regularly and frequently flown through the airspace over the plaintiffs' property at altitudes lower than the B–47 flights discussed in parts I and II of this opinion, the evidence does establish that the B–52 flights at altitudes as low as 124 feet above the surface of the ground have had a substantially greater effect upon the use and enjoyment of the plaintiffs' property than the B–47 flights at similar altitudes. In this connection, the evidence further shows that the beginning of the B–52 flights caused a decrease in the fair market value of the plaintiffs' property.

In some of the earlier avigation easement cases decided by this court, it was indicated that the taking by the Government of an easement of flight over a tract of land at a certain elevation empowered the Government thereafter to utilize the affected airspace for the operation of every kind of aircraft. For example, see the court's judgment in Adaman Mutual Water Co. v. United States, supra, 143 Ct.Cl. at pp. 935–936. In more recent cases, however, the trend has been away from the earlier view. Of particular significance from the standpoint of the present litigation is the court's decision in Avery v. United States, 330 F.2d 640, 165 Ct.Cl. 357 (1964).

The *Avery* case involved, *inter alia*, certain parcels of land which were situated within the approach zone of a runway at a Naval Air Station in Florida. In October 1953, the Government acquired by condemnation a perpetual easement of flight over such lands for its "aircraft," without any express limitation as to type, at elevations as low as 29 feet above the ground. At the time when the avigation easement was acquired, the Government was operating over the parcels of land a type of aircraft that had one turbojet engine and two reciprocating engines. Commencing in January 1957, the Government began to operate twin-engine jet bombers over the lands. These bombers were heavier, they made more noise, and they caused greater vibration than the earlier aircraft; and the evidence showed that the introduction of the new type of aircraft had the effect of reducing the value of the lands. The court phrased the question before it as being "whether the introduction of larger, heavier, noisier aircraft can constitute a fifth amendment taking of an *additional* easement *even though* new aircraft do not violate the boundaries of the initial easement" (330 F.2d at 642, 165 Ct.Cl. at pp. 359–360). The court answered this question in the affirmative, holding "that a new and further taking occurred in 1957" (330 F.2d at 643, 165 Ct.Cl. at p. 362). A judgment was awarded to the owners of the affected lands.

The court's decision in *Avery* seems clearly to require that the beginning in August 1958 of regular and frequent flights by B–52's over the plaintiffs' property at altitudes as low as 124 feet from the surface of the ground be regarded as a new taking of an avigation easement for larger, noisier aircraft in the airspace previously utilized by B–47's and other aircraft. This view will necessarily lead to the entry of a judgment for the plaintiffs with respect to the damages that they sustained by virtue of the new taking.

The plaintiffs' property is zoned residential-agricultural. At all times ma-

terial to this litigation, it has been used for agricultural purposes by lessees of the plaintiffs. The land is generally level, and consists of three types of soil— sandy loam (265 acres), silty clay loam (90 acres), and clay (211 acres). The sandy loam soil is highly productive and is excellent for the growing of row crops, such as cotton; and the silty clay loam is a fairly good soil for row crops. The clay soil is stiff and is suitable for use as pasture land. There are no buildings of significance on the property.

The expert witnesses who testified at the trial, including those presented by the defendant, were in agreement that, just before the beginning of the B–52 flights at low altitudes over the plaintiffs' property in August 1958, some of the acreage in the western portion of the tract was suitable for subdivision into residential lots, and that such acreage had a substantially greater value for subdivision purposes than for agricultural purposes. The experts differed, however, regarding the extent of the acreage that was suitable for subdivision into residential lots, regarding the value of the acreage for subdivision purposes, and regarding the extent (if any) to which this potential use was affected by the beginning of the B–52 flights at low altitudes over the property.

With respect to the problem of the extent of the acreage that was suitable for subdivision into residential lots just prior to the beginning of the low B–52 flights over the plaintiffs' property, the opinions of the experts ranged from a low of 94 acres to a high of 141 acres. It seems to me, in this connection, that the most conservative estimate is the most persuasive one. It must be remembered that, prior to the advent of B–52's at Barksdale Air Force Base, the central portion of the plaintiffs' property had actually been subjected to regular and frequent overflights by various types of aircraft, including 6-engine jet bombers, at altitudes as low as 124 feet from the surface of the ground; and that the defendant really had the right to operate

such aircraft over the western portion of the property at similar low altitudes. These factors, in my opinion, would have a very limiting effect on the size of the strip of land in the western portion of the property that would be regarded as desirable for residential purposes by potential purchasers of building lots. Hence, I have accepted the 94-acre figure as being the appropriate one for the purpose now under consideration.

Turning to the question of the value for subdivision purposes of the 94-acre strip of land mentioned in the preceding paragraph, the opinions of the experts on valuation ranged from a low of $500 per acre to a high of $1,500 per acre. The most significant factual evidence bearing on this point pertained to the sale for subdivision purposes in April 1958 of some acreage adjoining the plaintiffs' property on the west, at a price of $1,600 per acre. In relating that sale to the value of the 94-acre portion of the plaintiffs' property for subdivision purposes, there are two factors that merit special consideration. In the first place, the other land adjoins the main highway serving the general area, whereas the plaintiffs' property is located about a mile from the main highway; and, secondly, the other land was not (so far as the evidence in this record shows) subject to an avigation easement, whereas the plaintiffs' property was already subject to an avigation easement for flights by aircraft, including 6-engine jet bombers, at altitudes as low as 124 feet from the surface of the ground. When these considerations are taken into account, it is my conclusion that the 94-acre parcel of the plaintiffs' property had a value of about $1,000 per acre for subdivision purposes just before B–52 flights at low altitudes over the plaintiffs' property began in August 1958.

The plaintiffs' expert witnesses expressed the opinion that the value of a portion of the plaintiffs' property for subdivision purposes was completely destroyed by the beginning of the B–52

flights at low altitudes over the property. On the other hand, the defendant's expert witnesses were of the opinion that the prospective use of a portion of the plaintiffs' property for subdivision purposes was unaffected by the low B–52 flights. On this point, I find the opinion of the plaintiffs' experts to be the more persuasive, in the light of the factual evidence concerning the great noise and the heavy vibration caused by the B–52 flights at low altitudes. In this connection, it is my finding that, after the beginning of the B–52 flights in August 1958, the highest and best use of the 94-acre parcel previously mentioned was for agriculture, and that this parcel had a fair market value of $350 per acre for agricultural use.

Except for the 94-acre parcel previously discussed in this part of the opinion, the highest and best use of the plaintiffs' property was not affected by the advent of B–52's at Barksdale Air Force Base. The highest and best use of the property was for agriculture just prior to the advent of the B–52's, and this continued to be the highest and best use of the property after the advent of the B–52's. While B–52 flights over the property at low altitudes interfered somewhat with farming operations, the evidence in the record is not sufficient to permit such interference to be measured in monetary terms.

It is my finding that the plaintiffs' property had an overall fair market value of $216,300 just before the B–52 jet bombers began to fly regularly and frequently through the airspace above the property at low altitudes in August 1958; and that, just after such flights began, the plaintiffs' property had a fair market value of $155,200. Hence, the beginning of such flights diminished the fair market value of the plaintiffs' property to the extent of $61,100.

On the basis of the court's decision in Avery v. United States, supra, I recommend that a judgment in the amount of $61,100 be entered for the plaintiffs.