Per Curiam:
This case was referred to Trial Commissioner Mastín Gr. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on November 22,1966. Exceptions to certain of the commissioner’s findings and his recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on plaintiff’s brief and oral argument of counsel, defendant having submitted pursuant to Pule 62(b) without exceptions or brief. Since the court agrees with the opinion, findings and recommendation of the commissioner, with slight modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.
*565 OPINION OF COMMISSIONER*
White, Commissioner:
This action was filed on April 16, 1965 to recover compensation for the alleged taking by the defendant of an avigation easement, or easement of flight, for its aircraft in the airspace above the plaintiff’s property, which is located in Bossier Parish, Louisiana. The taking allegedly resulted from flights made over the plaintiff’s property regularly, frequently, and at low altitudes by military aircraft of the defendant while operating to and from Barksdale Air Force Base, Louisiana.
The defendant concedes that it has taken an avigation easement in the airspace above the plaintiff’s property, but the defendant contends that the taking occurred more than 6 years prior to the filing of the plaintiff’s petition on April 16, 1965. Accordingly, the defendant asserts an affirmative defense against the present action on the basis of 28 U.S.C. § 2501, which provides in part that:
Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
The primary question to be decided by the court in the present case, therefore, is whether the plaintiff’s claim first accrued within, or prior to the beginning of, the 6-year period that immediately preceded the filing of the plaintiff’s petition on April 16,1965.
The claim for the taking of an avigation easement by the Government accrues, and the 6-year limitation period begins to run, when regular and frequent intrusions by Government aircraft into the airspace above land at low altitudes begin to interfere seriously with the use and enjoyment of the land. Brin v. United States, 159 Ct. Cl. 332, 339 (1962).
The petition in the present case indicates that the taking of the avigation easement 'by the defendant in the airspace above the plaintiff’s property occurred sometime in 1960, it being alleged that “In 1960 the Defendant substantially increased its flights and the number of its planes,” and that “During 1960 [and] continuously since that date, the defend *566 ant has operated its jet aircraft directly over the property of petitioner in increasing numbers.” At a pretrial conference, the time of the taking was fixed by plaintiff’s counsel as having been “in about April 1961.” The plaintiff’s position on this matter was later changed at the trial, when the plaintiff’s evidence was presented on the theory that the avigation easement in the airspace above the plaintiff’s property was taken by the defendant in April 1960.
The plaintiff owns 6.2556 acres of land situated about 4y2 miles east of Shreveport, Louisiana, on the north side of U.S. Highway 80. Some of the lots comprising the plaintiff’s present acreage were acquired by the plaintiff in March 1957, and the remainder were acquired by the plaintiff in July 1957.
After 'acquiring the land mentioned in the preceding paragraph, the plaintiff improved it with the construction thereon of an attractive, commodious, well-built, and well-equipped motor hotel, known as the Town and Country Motor Hotel. The motor hotel was completed and opened for business on June 23,1958.
The plaintiff’s property is located north of, and rather close to, Barksdale Air Force Base, an important military installation and airfield, which has been under the control of the Strategic Air Command, United States Air Force, since about February 1951. The plaintiff’s property lies wholly within the approach zone to the northwest end of the northwest-southeast runway at Barksdale. At the nearest point, the property is approximately 6,240 feet from the northwest end of the runway. The plaintiff’s property is situated east of the center line of the northwest-southeast runway, as projected in the northwest approach zone. The southwest corner of the property, which is the portion nearest to the center line of the northwest-southeast runway, as projected in the northwest approach zone, is approximately 254 feet east of the center line of the runway, as projected.
The northwest-southeast runway is the main runway at Barksdale Air Force Base. This runway was originally completed in August 1943 to a length of 10,156 feet. In November 1955, the northwest-southeast runway was extended by adding 1,600 feet to its southeast end. Since that time, the runway has had a total length of 11,756 feet.
*567 Flying activities began at Barksdale Air Force Base in 1932. However, all the aircraft assigned to Barksdale up until November 1948 were propeller-driven aircraft. There is no contention made by either party in the present case that flights by propeller-driven military aircraft through the airspace above the plaintiff’s property interfered with the use and enjoyment of the property to such a substantial extent as to constitute the taking of an avigation easement in the airspace. Cf. Adaman Mutual Water Co. v. United States, 143 a. Cl. 921, 923, 181 F. Supp. 658, 659 (1958); Mid-States Fats and Oils Corp. v. United States, 159 Ct. Cl. 301, 304 (1962); A. J. Hodges Industries, Inc. v. United States, 174 Ct. Cl. 259, 264, 355 F. 2d 592, 595-596 (1966).
Therefore, we are concerned in the present case only with flights by jet aircraft to and from Barksdale Air Force Base. In this connection, it should be mentioned that all jet aircraft operating to or from Barksdale have used the northwest-southeast runway. As previously mentioned, the plaintiff’s property lies wholly within the northwest approach zone to that runway, and fairly close to the center line of the runway, as projected in the northwest approach zone.
The first jet aircraft assigned to Barksdale Air Force Base were B-45 4-engine jet bombers of the 47th Bombardment Wing. That wing, with its B-45 jet bombers, arrived at Barksdale in November 1948. B-45’s or BB-45’s (the BB-45 was a B-45 modified somewhat for reconnaissance purposes) were assigned to Barksdale until the early 1950’s.
Beginning in 1951 and continuing for several years thereafter, the 301st and the 376th Bomb Wings of the Strategic Air Command were stationed at, and were the major tactical organizations operating aircraft from and to, Barksdale Air Force Base. The 301st Bomb Wing was equipped with and operating B-47 6-engine jet bombers by August 1953, and the 376th Bomb Wing was equipped with and operating B~47’s by February 1954. B-47’s were assigned to Barksdale until June 1958.
The 4238th Strategic Wing of the Strategic Air Command was organized at Barksdale Air Force Base on March 1,1958. Beginning in August 1958 and continuing until the present time, this organization has been equipped with, and has *568 operated, B-52 8-engine jet bombers and KC-135 4-engine jet tankers.
The petition, as supplemented by the position which the plaintiff took at the trial, asserts that in April 1960 the defendant substantially increased the number of jet aircraft assigned to Barksdale Air Force Base and the number of flights by jet aircraft from and to Barksdale. This allegation is not supported by the evidence in the record.
In April 1960 — the crucial month from the standpoint of the plaintiff’s theory of the case — there were 16 B-52 jet bombers assigned to Barksdale Air Force Base. However, the same number of B-52’s had been assigned to Barksdale ever since February 1959, which was prior to the beginning of the 6-year limitation period under 28 U.S.C. § 2501. With respect to KC — 135 jet tankers, there were 11 of these aircraft assigned to Barksdale in the crucial month of April 1960, but this same number of KC~135’s had been assigned to Barksdale ever since August 1959, and there had been 10 KC-135’s assigned to Barksdale from December 1958 (which was long prior to the beginning of the 6-year limitation period) through July 1959.
It should also be mentioned that as early as July 1954, there had been 90 B-47 jet bombers assigned to Barksdale, and that the number of B-47’s assigned to Barksdale ranged between 90 and 106 during the period July 1954-November 1957. The number of B-47’s assigned to Barksdale ranged between 44 and 47 during the period December 1957-June 1958 (except for May 1958, when 37 B-47’s were assigned to Barksdale). No B-47’s were assigned to Barksdale after June 1958.
Furthermore, the number of flights by jet aircraft from and to Barksdale Air Force Base did not increase in the crucial month of April 1960, as contended by the plaintiff. In April 1960, B-52 jet bombers made 35 takeoffs from, and 36 landings at, Barksdale Air Force Base. By contrast, B-52’s made 76 takeoffs from, and 76 landings at, Barksdale in March 1959, the month just before the beginning of the 6-year limitation period. Indeed, B-52’s made substantially fewer takeoffs from and landings at Barksdale in April 1960 than these aircraft made during any month in the year 1959 or during any month in the period October-December of 1958.
*569 Unfortunately, the statistical information in the record concerning takeoffs and landings by KO-135 jet tankers are consolidated with similar data respecting KC-97 4-engine propeller-driven tankers. The evidence shows, however, that there were 133 takeoffs by KC-135’s and KC-97’s from Barksdale Air Force Base in April I960, and 133 landings by such aircraft at Barksdale during the same month. In March 1959, the month just before the beginning of the 6-year limitation period, there were 180 takeoffs and 181 landings by KC-135’s and KC-97’s. These aircraft made substantially fewer takeoffs from and landings at Barksdale in April 1960 than they made during any month in 1959 or during any month in the period October-December of 1958.
Adverting to the period when B-47 jet bombers were assigned to Barksdale Air Force Base, it is interesting to note that the monthly takeoffs by these aircraft from Barksdale Air Force Base during 1957 ranged from a high of 538 in July to a low of 218 in December, and that the monthly takeoffs during the period January-May of 1958 ranged from a high of 296 in January to a low of 171 in May. The statistics relative to landings at Barksdale by B-47’s during 1957 and during the period January-May of 1958 were similar to the data on takeoffs, with slight variations.
Therefore, the evidence in the record shows that, contrary to the allegations in the petition as supplemented by the position which the plaintiff took at the trial, there was no increase in the number of jet aircraft assigned to Barksdale Air Force Base, and there was no increase in the number of flights by jet aircraft from or to Barksdale, in April 1960, when the data for that month are compared with similar data for months antedating the beginning of the 6-year limitation period.
The petition, as supplemented by the position which the plaintiff took at the trial, also alleges that during and since April 1960 the defendant “has operated its jet aircraft directly over the property of petitioner in increasing numbers.” Consideration will now be given to this particular allegation.
All the jet aircraft previously mentioned as having been assigned to Barksdale Air Force Base have used the northwest-southeast runway for takeoffs and landings. Because of the prevailing wind conditions, a majority of the monthly *570 landings by jet aircraft onto the northwest-southeast runway have 'been from the northwest and in a southeasterly direction. The preponderance of landings from the northwest over landings from the southeast has been especially great during the period May-August of each year. Conversely, a majority of the monthly takeoffs by jet aircraft from the northwest-southeast runway have been in a southeasterly direction; and the preponderance of takeoffs toward the southeast over takeoffs toward the northwest has been especially great during the period May-August of each year.
As the plaintiff’s property is situated north of Barksdale Air Force Base, jet aircraft taking off from the northwest-southeast runway at Barksdale toward the southeast, and jet aircraft approaching the northwest-southeast runway from the southeast preparatory to landing in a northwesterly direction, have not invaded the airspace above the plaintiff’s property. Consequently, we are concerned only with jet aircraft taking off from the northwest-southeast runway toward the northwest, and with jet aircraft approaching the northwest-southeast runway from the northwest preparatory to landing in a southeasterly direction.
In this connection, it is significant to note that the northwest-southeast runway at Barksdale Air Force Base has had its present length of 11,756 feet since November 1955. The traffic pattern followed by jet aircraft taking off from this runway toward the northwest, and the traffic pattern followed by jet aircraft approaching this runway from the northwest preparatory to landing in a southeasterly direction, have been substantially the same from 1957 until the present time.
The evidence shows that B-47 jet bombers during the period January 1957-June 1958, that B-52 jet bombers beginning in August 1958 and continuing to the present time, and that KC-135 jet tankers beginning in August 1958 and continuing to the present time, have regularly and frequently intruded into the airspace above the southwesterly portion of the plaintiff’s property on takeoffs toward the northwest. However, such intrusions have customarily been at elevations of 500 feet or higher above the ground. It has been held that the airspace above noncongested areas, beginning at the *571 500-foot level from the surface of the ground, is navigable airspace in which there is a public right of freedom of transit. Matson v. United States, 145 Ct. Cl. 225, 229, 171 F. Supp. 283, 286 (1959); Aaron v. United States, 160 Ct. Cl. 295, 300, 311 F. 2d 798, 801 (1963). Therefore, the taking of the avigation easement by the defendant in the airspace above the plaintiff’s property is not attributable to flights by jet aircraft through such airspace shortly after taking off toward the northwest from the northwest-southeast runway at Barksdale Air Force Base.
The evidence also shows that B-47 jet bombers during the period January 1957-June 1958, that B-52 jet bombers beginning in August 1958 and continuing to the present time, and that KC-135 jet tankers 'beginning in August 1958 and continuing to the present time, have regularly and frequently intruded into the airspace above the southwesterly portion of the plaintiff’s land at elevations of less than 500 feet above the surface of the ground, when approaching the northwest-southeast runway at Barksdale Air Force Base from the northwest preparatory to landing in a southeasterly direction. Such intrusions were regularly and frequently made at 305 feet above the ground level during the period January 1, 1957-October 14, 1959, at 343 feet above the ground level during the period October 15,1959-January 28, 1960, at 323 feet above the ground level during the period January 29,1960-January 11,1961, and at 335 feet above the ground level from January 12,1961 to the present time.
This court has held in other cases that regular and frequent flights by B-47 jet bombers over privately owned land at altitudes of less than 500 feet above the ground level constituted the taking of an avigation easement over the subjacent land. Highland Park, Inc. v. United States, 142 Ct. Cl. 269, 161 F. Supp. 597 (1958); Dick v. United States, 144 Ct. Cl. 424, 169 F. Supp. 491 (1959); Jensen v. United States, 158 Ct. Cl. 333, 305 F. 2d 444 (1962); A.J. Hodges Industries, Inc. v. United States, 174 Ct. Cl. 259, 355 F. 2d 592 (1966). In this connection, the evidence in the present record shows that, in so far as the human ear is concerned, the noise made by a B-47 when approaching the runway preparatory to landing is substantially equal to the noise *572 made by a B-52 or a KC-135 under similar circumstances.[1] It is not necessary in tbe present case, however, to decide whether flights by B-47’s through the airspace above the plaintiff’s property at low altitudes during the period that ended in June 1958 constituted the taking of an avigation easement in the airspace.
Even if we limit our consideration to the flights by B-52 jet bombers and KC-135 jet tankers through the airspace above the plaintiff’s land at low altitudes, it is clear that such flights had already constituted the taking of an avi-gation easement in the airspace prior to the beginning of the 6-year limitation period that is pertinent to this case. The same types of B-52 jet bombers and KC-135 jet tankers that regularly and frequently invaded the airspace above the southwesterly portion of the plaintiff’s property at low altitudes in April 1960, when approaching the northwest-southeast rim way at Barksdale Air Force Base from the northwest preparatory to landing in a southeasterly direction, had been following substantially the same traffic pattern and intruding into such airspace at similar elevations — and with even greater frequency — for several months prior to the beginning of the 6-year limitation period. Therefore, the conclusion is inescapable that the taking by the defendant of the avigation easement in the airspace above the plaintiff’s property occurred, and that the plaintiff’s claim first accrued, more than 6 years prior to the filing of the petition on April 16,1965.
The plaintiff introduced evidence to the effect that its guests were not bothered prior to April 1960 by flights of aircraft over the property. However, such evidence of a subjective nature cannot overcome the information in the record to the effect that the same types of jet aircraft that operated from and to Barksdale Air Force Base in April I960 and thereafter had been following substantially the same traffic pattern, had been flying at substantially similar elevations, and had been operating with even more frequency, during the months that antedated the beginning of the 6-year limitation period.
*573 Accordingly, it is concluded that the plaintiff delayed the institution of the present action too long, and that the petition must be dismissed under the mandatory language of 28 U.S.C. § 2501.
FINDINGS on Fact
1. (a) This action was filed on April 16, 1965 'to recover compensation for the alleged taking by the defendant in April 1960[1] of an easement of flight for its aircraft in the airspace above certain real property owned by the plaintiff, consisting of seven lots, with improvements thereon, located in Bossier Parish, Louisiana. The taking allegedly resulted from flights made over the property regularly, frequently, and at low altitudes by military aircraft of the defendant while operating to and from Barksdale Air Force Base, Louisiana.
(b) The defendant concedes that it has taken an easement of flight in the airspace above the plaintiff’s property, but the defendant contends that the taking occurred more than 6 years prior to the filing of the plaintiff’s petition on April 16,1965.
2. (a) The plaintiff is a corporation organized and existing under the laws of the State of Louisiana, with its registered office in Bossier City, Bossier Parish, Louisiana.
(b) The Articles of Incorporation of the plaintiff were filed in Bossier Parish, Louisiana, in 1957. The name of the corporation at that time was Kim’s Desert Inn, Inc.
(c) In 1959, the original Articles of Incorporation of the plaintiff were amended and the name of the corporation was changed to Town and Country Motor Hotel, Inc.
3. Great Southern Life Insurance Company of Houston, Texas, is the holder of a mortgage on the plaintiff’s property and has been joined as a party plaintiff. All other mortgagees have filed appearances and disclaimers.
4. (a) The real property involved in this litigation is located on the north side of U.S. Highway 80. It is an irregular-shaped tract, having a frontage of 525 feet on the highway and a depth of 700 feet.
*574 (b) The ownership was derived from three subdivisions:
(1) First, there is Lot 6 of Woodward Farms Subdivision, Unit #3. This lot has 225 feet of frontage on U.S. Highway 80 and a depth of 700 feet, and it contains 3.6157 acres.
There are four lots out of the Jeter and Hankins Subdivision on the west side of Lot 6. Lot 9 of this subdivision has 100 feet of frontage on U.S. Highway 80 and is 200 feet in depth. Lots 12,13, and 14 are 200 feet to the rear of Lot 9, and these three lots form an area of 200 feet by 300 feet. These lots have an area of 0.4591 acre each, -or a total of 1.8364 acres.
(3) Lots 8 and 9 of the Howard Subdivision lie on the east side of Lot 6. These two lots provide 200 feet of frontage on U.S. Highway 80 and 175 feet of frontage on Ann Street. The area in these two lots is 0.8035 acre.
(c) The total acreage of the entire property owned by the plaintiff amounts to 6.2556 acres.
(d) The majority of the improvements on the plaintiff’s property are on Lot 6 of Woodward Farms Subdivision, Unit #3.
5. (a) Title to Lot 6 of Woodward Farms Subdivision, Unit #3, was acquired by Michel A. Maroun and wife and six other individuals on April 26-27, 1956, for a total consideration of $15,750.
(b) Title to Lot 9 of Jeter and Hankins Subdivision was also acquired by Michel A. Maroun and wife and six other individuals on April 26-27,1956, for a total consideration of $3,250.
(c) On December 4,1956, Michel A. Maroun and wife purchased the interest of the six other individuals in Lot 6 of Woodward Farms Subdivision, Unit #3, and in Lot 9 of Jeter and Hankins Subdivision for $1,500.
(d) On December 4, 1956, Merle Floyd Kemmerly, Jr., Michel A. Maroun, and their respective wives acquired title to Lots 8 and 9 of Woodward Farms Subdivision for a total consideration of $15,000.
(e) On December 8,1956, Michel A. Maroun and wife conveyed an undivided one-third interest in Lot 6 of Woodward Farms Subdivision, Unit #3, and in Lot 9 of Jeter and *575 Hankins Subdivision to Merle Floyd Kemmerly, Jr., and wife for $1,500 and other valuable consideration.
(f) In about March 1957, Michel A. Maroun and Merle F. Kemmerly, Jr., organized the Kim’s Desert Inn Corporation.
(g) On March 7,1957, Michel A. Maroun, Merle F. Kem-merly, Jr., and their respective wives transferred title to Lot 6 of Woodward Farms Subdivision, Unit #3, Lot 9 of Jeter and Hankins Subdivision, and Lots 8 and 9 of Howard Subdivision to the newly formed corporation, in consideration of 960 shares of capital stock at a par value of $100 a share.
(h) On July 5, 1957, the Kim’s Desert Inn Corporation acquired title to Lots 12, 13, and 14 of Jeter and Hankins Subdivision, for a total consideration of $4,500.
6. (a) The land referred to in findings 4 and 5 has been improved by the plaintiff with the construction thereon of an attractive, commodious, and well-equipped motor hotel known as the Town and Country Motor Hotel. The improvements consist of a large administration building fronting on U.S. Highway 80 and containing approximately 11,000 square feet of space, a pool area, and 100 rental units, 12 of these being cabana units in the vicinity of the pool and the remaining 88 units being divided equally among four buildings. In the administration building, the motor hotel has a cocktail lounge, an upper dining room, a lower dining room, an open dining room, a glassed-in area overlooking the pool for use as a restaurant or lounge, and a small banquet room.
(b) The motor hotel is constructed of steel, masonry, and brick. There is structural steel in the administration building, and light metal and Strand steel in the buildings that contain the rental units. The ceilings are of beaverboard. The attics have 6 inches of insulation. The construction is triple-A.
(c) The motor hotel is air-conditioned by a central air-conditioning system (York), with two 60-ton compressors.
(d) The motor hotel was completed and opened for business on June 23,1958.
*576 7. (a) The Town and Country Motor Hotel is located about 4% miles east of Shreveport, Louisiana, on the north side of U.S. Highway 80 in an area that is known as “The Strip.” The area known as “The Strip” has restaurants, cocktail lounges, motor hotels, and business places, such as tractor companies, etc.
(b) The Town and Country Motor Hotel is outside the limits of any incorporated city, and is not within a congested area.
8. (a) The plaintiff’s property is located north of Barks-dale Air Force Base. It lies entirely within the approach zone to the northwest end of the northwest-southeast runway at Barksdale Air Force Base, at distances from the northwest end of the runway ranging from approximately 6,240 feet to 6,863 feet. The distances from the improvements on the property to the northwest end of the runway range from 6,245 feet to 6,763 feet.
(b) The plaintiff’s property is situated east of the center line of the northwest-southeast runway at Barksdale Air Force Base, as projected in the approach zone to the northwest end of the runway. The distances from the improvements to the center line of the runway, as projected in the northwest approach zone, range from approximately 382 feet to 668 feet. The southwest comer of the site of the motor hotel is the nearest point to, and lies 254.1 feet eastward from, the center line of the runway, as projected in the northwest approach zone. The western boundary line of Lots 12, 13, and 14 of the Jeter and Hankins Subdivision, purchased by the plaintiff on July 5, 1957, lies east of the projected center line of the runway at distances ranging from 365 feet to 468 feet.
9. Since about February 1951, Barksdale Air Force Base has been under the control of the Strategic Air Command, United States Air Force.
10. (a) The main runway at Barksdale Air Force Base is the northwest-southeast runway, also known as runway 32-14. (It is runway 32 for aircraft taking off or landing in a northwesterly direction, and runway 14 for aircraft taking off or landing in a southeasterly direction.) This runway was originally completed in August 1943 to a length of 10,156 *577 feet. In November 1955, runway 32-14 was extended by adding 1,600 feet to its southeast end. Since that date, the runway has had a total length of 11,756 feet.
(b)All jet aircraft taking off from or landing at Barks-dale Air Force Base have used the northwest-southeast runway.
11. (a) Flying activities began at Barksdale Air Force Base in November 1932. The first aircraft assigned to the base were P-12 and P-26 single-engine pursuit planes. In 1937, A-18 attack aircraft were assigned to the base, and also B-17 4-engine bombers. The inventory of aircraft at the base was increased in 1940 with the assignment of P-40 single-engine pursuit and A-20 twin-engine attack aircraft.
(b) In the latter part of 1940, all tactical aircraft were reassigned to other airfields, and Barksdale was used thereafter for a time as a training base. Four flying schools were maintained there, and they used B-10, B-12, B-18, AT-6, AT-12, P-35, and P-36 aircraft.
(c) By January 1942, all the flying schools had been moved from Barksdale; and in February 1942, B-24 4-engine bombers were assigned there. By July 1942, all the B-24’s had been transferred from Barksdale and had been replaced with B-25 and B-26 twin-engine bombers. These aircraft remained at Barksdale until 1947.
(d) All the aircraft mentioned in this finding were propeller-driven.
12. The first jet aircraft assigned to Barksdale Air Force Base were B-45 4-engine jet bombers of the 47th Bombardment Wing. That wing, with its B-45 jet bombers, arrived at Barksdale in November 1948. B-45’s or KB-45’s (the BB-45 was a B-45 modified somewhat for reconnaissance purposes) were assigned to Barksdale until the early 1950’s.
13. The 3d Strategic Support Squadron, equipped with C-124 4-engine propeller-driven cargo aircraft, was assigned to Barksdale Air Force Base in December 1949. C-124’s have been operated at Barksdale since that time.
14. (a) In February 1951, the 301st Bomb Wing of the Strategic Air Command was assigned to Barksdale Air Force Base, and in October 1951 the 376th Bomb Wing of SAC was assigned there. For several years thereafter, these two *578 wings constituted the major tactical organizations flying sorties from Barksdale.
(b) At the time of its assignment to Barksdale in February 1951, the 301st Bomb Wing was equipped with RB-45 4-engine jet reconnaissance bombers and KB-29 4-engine propeller-driven tankers. During the period April-July 1953, this wing was in the process of replacing its BB-45’s and KB-29’s with B-47 6-engine jet bombers and KC-97 4-engine propeller-driven tankers. As of August 1953, the wing had 36 B-47’s and 20 KC-97’s, and it still had 10 KB-29’s. The KB-29’s were apparently disposed of after September 1953. By September 1953, the number of B-47’s had increased to 46. The B-47’s began to operate in 'September 1953. This wing discontinued its operations at Barksdale and was transferred elsewhere in April 1958.
(c) When the 376th Bomb Wing arrived at Barksdale in October 1951, it -vyas equipped with B-29 4-engine propeller-driven bombers. In September 1953, some KC-97 4-engine propeller-driven tankers were assigned to this wing. During the month of January 1954, the B-29’s were phased out and, beginning in February 1954, they were replaced with B-47 6-engine jet bombers. At the end of March 1954, this wing had 29 B-47’s and 22 KC-97’s. The number of B-47’s had increased to 48 by the end of May 1954. The 376th Bomb Wing was transferred to another installation in December 1957.
(d) The number of KC-97’s at Barksdale decreased from 42 during the period January-June of 1959 to 21 in July 1959. The number did not rise above 22 during the period August 1959-May 1961. The number was 15 in June 1961, and 11 during the period July 1961-June 1963. No KC-97’s were assigned to Barksdale after June 1963.
15. The number of B-47’s assigned to Barksdale Air Force Base had reached 90 by July 1954, and the number ranged between 90 and 99 until December 1955 (except for March 1955, when 103 B-47’s were assigned to Barksdale), between 101 and 106 during the period January 1955-November 1957 (except for June 1957, when 98 B-47’s were assigned to Barksdale), and between 44 and 47 during the period December 1957-June 1958 (except for May 1958, when 37 B-47’s *579 were assigned to Barksdale). No B-47’s were assigned to Barksdale after June 1958.
16. (a) The 4238th Strategic Wing of the Strategic Air Command was organized at Barksdale Air Force Base on March 1,1958.
('b) Beginning in August 1958 and continuing until the present time, B-52 8-engine jet bombers have been assigned to Barksdale Air Force Base. There were 2 B-52’s assigned to Barksdale in August 1958, 7 in September 1958, 12 in October and in November 1958, 15 in December 1958 and January 1959, and 16 in February 1959. The number of B-52’s assigned to Barksdale remained at 16 until June 1960. During the period July 1960-December 1964, the number of B-52’s assigned to Barksdale ranged from a low of 10 to a high of 18, the low point of 10 having been reached in October 1960 and the high point of 18 having been reached in the months of October, November, and December 1964.
(c) From August 1958 until the present time, KC-135 4-engine jet tankers have been assigned to Barksdale. There was 1 KC-135 assigned to Barksdale in August and September 1958, 3 in October and in November of 1958, and 10 in December 1958. The number remained at 10 during the period January-July 1959. There were 11 KC-135’s assigned to Barksdale during the period August 1959-July 1961. The number then fluctuated between a low of 9 and a high of 21 during the period August 1961-December 1964. The low figure of 9 was reached in August 1961, and the high figure of 21 was reached in August 1964.
(d) Tire B-52 is larger than the B-47. The engines of the B-52 develop approximately twice as much thrust as the engines of the B-47.
17. (a) In so far as the human ear is concerned, the noise made by a B-47 when approaching the runway preparatory to landing is substantially equal to the noise made by a B-52 or a KC-135 under similar circumstances.
(b) On takeoffs, the engines of a B-47 have much less thrust than, and are substantially less noisy than, the engines of a B-52 or the engines of a KC-135.
18. The numbers of aircraft of all types assigned to Barks-dale Air Force Base during the several months in the 4-year period 1957-1960 are shown in the following table:

*580

19. (a) The ground control approach (GCA) glide slope for runway 14 at Barksdale Air Force Base from January 1, 1957 to October 14,1959 was set at an angle of 2.50 degrees. The height from ground level to the glide slope over the southwesterly portion of the plaintiff’s property for that period was 305 feet; and aircraft landing on runway 14 under the GCA system passed near or over the southwesterly portion of the plaintiff’s property at 305 feet above ground level.
(b) From Otober 15, 1959 to January 28, 1960, the GCA glide slope for runway 14 was set at an angle of 2.82 degrees; and aircraft landing on runway 14 under the GCA system passed near or over the southwesterly portion of the plaintiff’s property at 343 feet above ground level.
(c) From January 29,1960 to January 11,1961, the GCA glide slope for runway 14 was set at an angle of 2.65 degrees; and aircraft landing under the GCA system on runway 14 passed near or over the southwesterly portion of the plaintiff’s property at 343 feet above ground level.
(d) From January 12,1961 to date, the GCA glide slope for runway 14 has been set at an angle of 2.75 degrees; and aircraft landing under the GCA system on runway 14 have been passing near or over the southwesterly portion of the plaintiff’s property at 335 feet above ground level.
(e) The touchdown point for the GCA glide slope is 750 feet inside the end of runway 14. The distance from that point to the southwesterly portion of the plaintiff’s property is 6,990 feet.
*581 20. (a) The traffic pattern followed by aircraft landing from the northwest in a southeasterly direction on the northwest-southeast runway at Barksdale Air Force Base was the same in 1960 as it had been in 1957-1959.
(b) The traffic pattern followed by aircraft taking off toward the northwest from the northwest-southeast runway at Barksdale Air Force Base was the same in 1960 as it had been in 1957-1959.
21. (a) The defendant’s aircraft taking off in a southeasterly direction from runway 14 do not intrude in the airspace above the plaintiff’s property, and aircraft landing from the southeast in a northwesterly direction on runway 32 do not intrude in the airspace above the plaintiff’s property.
(b) The intrusions in the airspace over the plaintiff’s property occur when the defendant’s aircraft are taking off in a northwesterly direction from runway 32 or landing from the northwest in a southeasterly direction on runway 14.
22. The B-52’s and the KC-135’s operating from Barks-dale Air Force Base do not take off in formation. However, when smaller aircraft were operating at Barksdale Air Force Base, they sometimes took off in formation. For this reason, the northwest-southeast runway was 500 feet wide.
23. Information regarding takeoffs from and landings on the northwest-southeast runway at Barksdale Air Force Base by B-47 6-engine jet bombers during the period April 1957-June 1958 is shown on the following table:

*582 24. The extent of the activity by B-52 8-engine jet bombers and KC-135 4-engine jet tankers at Barksdale Air Force Base during the period August 1958-April 1960 is indicated by the following table showing takeoffs from and landings on the northwest-southeast runway:

25. (a) The number of takeoffs by aircraft of all types from Barksdale Air Force Base during each of the months in the year 1960 was much smaller than the number of takeoffs from Barksdale during any month in the 3-year period 1957-1959.
(b) The number of landings by aircraft of all types at Barksdale Air Force Base during each of the months in the year 1960 was much smaller than the number of landings at Barksdale during any month in the 3-year period 1957-1959.
(c) During April 1960, there were 577 takeoffs by aircraft of all types from, and 579 landings by aircraft of all types at, Barksdale Air Force Base.
(d) During March 1959 — the month immediately preceding the beginning of the 6-year limitation period involved in this case — there were 1,360 takeoffs by aircraft of all types *583 from, and 1,364 landings by aircraft of all types at, Barksdale Air Force Base.
26. (a) During each month of the year, because of the prevailing wind conditions, a majority of the landings onto the northwest-southeast runway at Barksdale Air Force Base have been from the northwest and in a southeasterly direction. The preponderance of landings from the northwest over landings from the southeast has been especially great during the period May-August of each year.
(b) At all times pertinent to this litigation, aircraft approaching the runway from the northwest preparatory to landing in a southeasterly direction have regularly and frequently intruded into the airspace above the southwesterly portion of the plaintiff’s land at elevations of less than 500 feet above the ground. Such intrusions were regularly made at 305 feet above the ground level during the period January 1, 1957-October 14, 1959; at 343 feet above the ground level during the period October 15, 1959-Janu-ary 28, 1960; at 323 feet above the ground level during the period January 29, 1960-January 11, 1961; and at 335 feet above the ground level from January 12,1961 to the present time.
(c) Aircraft approaching the runway from the southeast preparatory to landing in a northwesterly direction have not intruded into the airspace above or near the plaintiff’s property.
27. (a) During each month of the year, a majority of the takeoffs from the northwest-southeast runway at Barksdale Air Force Base have been in a southeasterly direction. The preponderance of the takeoffs toward the southeast over takeoffs toward the northwest has been especially great during the period May-August of each year.
(b) Aircraft taking off toward the southeast have not intruded into the airspace above or near the plaintiff’s property.
(c) Aircraft taking off toward the northwest have regularly and frequently intruded into the airspace above or near the southwesterly portion of the plaintiff’s property, but such intrusions have customarily been at elevations 500 feet or higher above the ground.
*584 28. (a) The defendant has taken a perpetual easement of flight in the airspace above the plaintiff’s property at an elevation of 305 feet from the surface of the ground, and higher, for B-52 jet bombers and KC-135 jet tankers, and other aircraft causing similar or less interference with the use and enjoyment of the subjacent property.
(b) The taking of the easement of flight occurred more than 6 years prior to April 16,1965.
CoNClhsioN or Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule ©7 (a).

 On takeoffs, tlie engines of a B-47 develop much less thrust, and are substantially less noisy, than the engines of a B-52 or the engines of a KC-135.

 The time of the alleged taking was fixed by the plaintiff at a pretrial conference as April 1961, but at the trial the plaintiff contended that the time of the taking was April I960.